IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WAGUIH SIAG, INDIVIDUALLY, AND | § | |
| AS REPRESENTATIVE OF TOURISTIC | § | |
| INVESTMENT & HOTELS | § | |
| MANAGEMENT COMPANY (SIAG) | § | |
| And SIAG-TABA COMPANY | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 4:10-cv-367 |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:10-cv-2096 |
| KING & SPALDING LLP and | § | |
| REGINALD R. SMITH | § | (Consolidated Cases) |
| | § | |
| Defendants. | § | |

DEFENDANTS' RESPONSE TO
PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

I.      FACTUAL HISTORY OF THE PARTIES' DISPUTE ..................................... 1

II.     PROCEDURAL HISTORY OF THE PARTIES' DISPUTE ............................ 4

III.    GOVERNING LAW, LEGAL STANDARD, AND BURDEN OF PROOF TO
        OBTAIN INJUNCTIVE RELIEF ...................................................................... 5

        A.      The Provisions of the Federal Arbitration Act, Not the Texas Arbitration
                Act, Apply ............................................................................................. 5

        B.      Evidentiary Elements Plaintiffs Must Show to Obtain Injunctive Relief .............. 8

IV.     PLAINTIFFS DO NOT AND CANNOT SATISFY THE ELEMENTS FOR
        INJUNCTIVE RELIEF AS A MATTER OF LAW ......................................... 8

        A.      Plaintiffs' Request To Stay the LCIA Arbitration Proceedings ............................ 9

        B.      Plaintiffs' Request To Stay Enforcement of the Interim Order ........................... 10

                1.      No court could rule that the Arbitral Tribunal showed "evident
                        impartiality" under the FAA (9 U.S.C. § 10 (a)(2)) .................................. 12

                2.      No court could rule that the Arbitral Tribunal "exceeded its
                        powers" under the FAA (9 U.S.C. § 10(a)(4)) .......................................... 13

                3.      No court could rule that the Arbitral Tribunal was "guilty of
                        misconduct in refusing to postpone the hearing" under the FAA
                        (9 U.S.C. § 10(a)(3)) ................................................................................ 14

        C.      Plaintiffs' Request To Prohibit Defendants From Contacting Plaintiffs'
                Current and Prospective Business Partners and Associates Regarding the
                Interim Order Is Constitutionally Barred .............................................................. 15

V.      PLAINTIFFS' PROFFERED EXIGENT CIRCUMSTANCES ALLEGEDLY
        JUSTIFYING INJUNCTIVE RELIEF ARE EQUALLY INSUFFICIENT AND
        FAIL TO MEET THE SIAG'S BURDEN OF PROOF .................................. 16

        A.      The Siags' Arguments in Their TRO Motion ...................................................... 16

                1.      The continuation of the LCIA arbitration proceeding ............................. 17

                2.      The LCIA hearing allegedly to be scheduled between June 21 and
                        July 9, 2010 .............................................................................................. 19

         3.     Efforts to enforce the LCIA Tribunal's Interim Order, which Order is alleged to exceed the Tribunal's powers ..................................... 20

   B.    The Siags' Arguments in Their Application and Memorandum .......................... 24

         1.     Alleged partiality of certain members of the LCIA Court ........................ 24

         2.     Alleged partiality of the LCIA Tribunal itself (Mr. Gee) ......................... 25

         3.     Allegation that the LCIA Tribunal (Mr. Gee) exceeded its powers in issuing the Interim Order ..................................................................... 26

         4.     The validity of the arbitration clause in the parties' Contract of Representation ............................................................................................ 28

VI.    CONCLUSION ............................................................................................................. 28

CERTIFICATE OF SERVICE ................................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*Al-Harbi v. Citibank, N.A.,*
   85 F.3d 680 (D.C. Cir. 1996) ........................................................................................ 12

*Allied-Bruce Terminix Cos. v. Dobson,*
   513 U.S. 265 (1995 ......................................................................................................... 7

*ANR Coal Co., Inc. v. Cogentrix of N.C., Inc.,*
   173 F.3d 493 (4th Cir. 1999) ........................................................................................ 12

*Beiser v. Weyler,*
   284 F.3d 665 (5th Cir. 2002) .......................................................................................... 7

*City of Meridian v. Algernon Blair, Inc.,*
   721 F.2d 525 (5th Cir. 1983) ................................................................................. 8, 9, 10

*Deerfield Medical Ctr. v. City of Deerfield Beach,*
   661 F.2d 328 (5th Cir. 1981) .......................................................................................... 9

*Dole Ocean Liner Express v. Georgia Vegetable Co.,*
   84 F.3d 772 (5th Cir. 1996) .......................................................................................... 13

*Encompass Power Servs., Inc. v. Eng'g & Constr. Co.,*
   2005 WL 3234369, at *2 (S.D. Tex. 2005) ............................................................... 9, 10

*Flezen v. Andreas,*
   134 F.3d 873 (7th Cir. 1998) .......................................................................................... 7

*Graphic Commc'ns Union v. Chicago Tribune Co.,*
   779 F.2d 13 (7th Cir. 1985) .......................................................................................... 10

*Gulf Petro Trading Co., Inc. v. Nigerian Nat'l Petroleum Corp.,*
   512 F.3d 742 (5th Cir. 2008) .......................................................................................... 6

*In re Arbitration Between Trans Chemical Ltd. and China Nat'l Machinery Import and
Export Corp.,*
   978 F. Supp. 266 (S.D. Tex. 1997) ................................................................................. 6

*In re L & L Kempwood Assocs., L.P.,*
   9 S.W.3d 125 (Tex. 1999) (per curiam) .......................................................................... 8

*In re Nat'l Serv. Corp.,*
   742 F.2d 859 (5th Cir. 1984) ........................................................................................ 16

*In re Nationwide Credit, Inc.*,
  2010 WL 596809 (Tex. App.—Corpus Christi 2010, no pet. h.) .............................................. 6

*LIM v. Offshore Specialty Fabricators, Inc.*,
  404 F.3d 898 (5th Cir. 2005) ...................................................................................... 7

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  115 S. Ct. 1212 (1995) ............................................................................................ 22

*McGuire, Cornwell & Blakely v. Gride*,
  765 F. Supp. 1048 (D. Colo. 1991) ............................................................................ 8

*Medcam Inc. v. MCNC*,
  2004 WL 1790184 (D. Minn. 2004) .......................................................................... 10

*Mesa Operating Ltd. P'Ship v. La. Intrastate Gas Corp.*,
  797 F.2d 238 (5th Cir. 1986) ..................................................................................... 7

*Montez v. Prudential Sec., Inc.*,
  260 F.3d 980 (8th Cir. 2001) .................................................................................... 12

*Organization for a Better Austin v. Keefe*,
  91 S. Ct. 1575 (1971) .............................................................................................. 16

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.*,
  476 F.3d 278 (5th Cir. 2007) ................................................................................... 11

*Roehrs v. FSI Holdings, Inc.*
  246 S.W.3d 796, 803 (Tex. App.—Dallas 2008, pet. denied) ......................................... 8

*Sunguard Energy Sys. Inc. v. Gas Transmission Northwest Corp.*,
  551 F. Supp. 2d 608 (S.D. Tex. 2008) ....................................................................... 11

*Synder v. Smith*,
  736 F.2d 409 (7th Cir. 1984) ..................................................................................... 7

*Williams Indus., Inc. v. Fry's Elecs., Inc.*,
  2003 WL 21357441 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ............................... 22

## Statutes

9 U.S.C. § 10(a) ................................................................................................ 11, 13

9 U.S.C. §§ 1 et seq............................................................................................... 10

Defendants King & Spalding LLP and Reginald R. Smith respectfully request that Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion") be denied.[1]  Plaintiffs' bare-bones, five-page TRO Motion incorporates by reference a number of voluminous pleadings upon which it relies for nearly all of its legal and evidentiary arguments.[2]  *See* TRO Motion at 1-2.  The specific injunctive relief requested by Plaintiffs in those pleadings is that Defendants be enjoined from (1) proceeding with the currently pending arbitration before the London Court of International Arbitration (LCIA), (2) enforcing the Interim Order issued by the LCIA Tribunal, and (3) contacting Plaintiffs' current and prospective business partners and associates regarding that Interim Order.  *See id.* at 2.  For the reasons set forth below, Plaintiffs fail to satisfy the elements required to obtain injunctive relief, and their descriptions of the procedural posture, substantive issues in dispute, and current status of the pending arbitration proceeding and removed state court lawsuit are less than complete.

## I.    FACTUAL HISTORY OF THE PARTIES' DISPUTE

King & Spalding represented Plaintiffs Waguih Siag, Touristic Investment & Hotels Management (SIAG) S.A.E., and Siag-Taba Company (collectively, the "Siags") in a five-year arbitration before the International Centre for Settlement of Investment Disputes (ICSID) against the Arab Republic of Egypt ("Egypt") over Egypt's expropriation of a 161-acre resort property

---

[1]  Defendants file this pleading subject to and without waiver of their motion to compel arbitration that is currently pending before this Court.

[2]  Plaintiffs' TRO Motion incorporates by reference Plaintiffs' (i) Application for Order to Vacate Arbitrator's March 30, 2010 London Court of International Arbitration Order and Award and Stay Arbitration Proceedings ("Plaintiffs' Application"); (ii) Memorandum of Law in Support of Application for Order to Vacate Arbitrator's March 30, 2010 London Court of International Arbitration Order and Award and Stay Arbitration Proceedings, and Petition for Temporary Restraining Order and Temporary Injunction ("Plaintiffs' Memorandum"); and (iii) Affidavit of Waguih Siag in Support of Application for Order to Vacate Arbitrator's March 30, 2010 London Court of International Arbitration Order and Award and Stay Arbitration Proceedings, and Petition for Temporary Restraining Order and Temporary Injunction ("Affidavit of Waguih Siag").

1

near the city of Taba on the Red Sea.   That representation was conducted pursuant to a contingency fee agreement.   *See* Ex. 1 (Contract of Representation).   To say that the ICSID arbitration was difficult and challenging would be an understatement.   *See generally* Ex. 2 at Parts I-II (King & Spalding's Statement of Case filed in the LCIA arbitration and discussing in detail King & Spalding's five years of work for the Siags); Ex. 3 (Witness Statement of Reginald Smith filed with King & Spalding's Statement of Case); Ex. 4 (Witness Statement of Kenneth Fleuriet filed with King & Spalding's Statement of Case).[3]   The Siags' ICSID arbitration was hotly contested, involved complicated issues of jurisdiction and damages, and spanned five years of intense work by King & Spalding.   *See* Ex. 2 at Part II; *see also* Exs. 3-4.   The Siags had nothing but praise for the work of King & Spalding during that representation.   *See id.*   On June 1, 2009, after five years of litigation, the ICSID arbitration tribunal awarded the Siags approximately $133 million, which was a tremendous victory (especially considering the Siags had only invested $13 million in their planned resort development that was the subject of the ICSID arbitration).   *See id.* ¶ 73.   This award is believed to be the largest ICSID award ever granted to individual investors and the seventh largest ICSID award in history at the time it was issued.   *See id.* ¶ 88.

For all of its five years of work in achieving this award, and pursuant to its contingency fee contract with the Siags, King & Spalding had been paid nothing as of June 2009 because King & Spalding would only recover if the Siags recovered.   *See id.* at Part II.   Collection from Egypt was a task once again fraught with risk because Egypt immediately filed an annulment proceeding to vacate the ICSID award and intended to fight enforcement at every turn, just as it had fought the underlying merits in the ICSID arbitration.   *See id.* at Part II(H).   The Siags,

---

[3]   For the sake of not overwhelming the Court's files, King & Spalding has not filed the 245 exhibits that accompany its Statement of Case, but it would be pleased to do so at the Court's request.

however, hatched a nefarious plan to avoid *any* payment to King & Spalding—ever.   In November 1999, they secretly settled with Egypt behind King & Spalding's back while repeatedly representing to King & Spalding that no settlement negotiations were underway, and they then refused to pay King & Spalding *anything* for the firm's five years of work in open breach of the parties' contingency fee contract. *See id.* at Part II(I).[4]   To date, King & Spalding has received no compensation for any of its work on behalf of the Siags. *See id.* The equities of this case lie wholly in one direction: with King & Spalding.

Plaintiffs' TRO Motion incorporates by reference Plaintiffs' Application and Memorandum.  Those pleadings make any number of factual statements that are incorrect, but a few are worth pointing out immediately.  First, King & Spalding has never sought to collect an 80% contingency fee from the Siags. *See id.* ¶¶ 70-71, 79-80.  Rather, it has continually sought to deal fairly with the Siags. *See id.* In the fee dispute currently pending between the parties before the LCIA, King & Spalding seeks a contingency fee of 45%, *see id.* ¶ 111, which is wholly justified and enforceable under Texas law as fully briefed to the LCIA Tribunal, *see id.* at Part III(A)-(B).  This was never a case about an 80% contingency fee; rather, it is a case about creative clients stiffing their lawyers and then using every legal means available to avoid their contractual, equitable, and moral obligations.

Second, the Siags conveniently ignore the entire history of King & Spalding's five-year representation, the Siag's effusive praise of King & Spalding throughout that representation, and the fact that they settled with Egypt behind King & Spalding's back while repeatedly representing that no settlement discussions were underway. *See id.* at Part II.  In addition, the

---

[4]  In fact, the Contract of Representation required that "any payment of a settlement . . . by Egypt shall be made into a client escrow account maintained by [King & Spalding]" so that King & Spalding's fee interest would first be "deducted" and the "balance shall be wire transferred to" the Siags. *See* Ex. 1 art. 2. The Siags openly violated this contractual protection afforded to King & Spalding. *See* Ex. 2 ¶ 85.

Siags failed to deposit the settlement amount into an escrow account as required by the parties' contract, and they have not paid King & Spalding a dime for any of its work. *See id.* ¶ 85.

Third, the Siags' assertion that they are owed $53 million in damages is simply preposterous. That figure is arrived at by subtracting the Siags' $80 million secret settlement from the $133 million ICSID award. While King & Spalding did achieve the $133 million ICSID award, it had nothing to do with the settlement, gave no advice on its amount, and can in no way be responsible for what the Siags did behind King & Spalding's back in the face of multiple, rebuffed efforts by King & Spalding to arrive at a reduced legal fee. *See id.* at Part II(I).

## II.    PROCEDURAL HISTORY OF THE PARTIES' DISPUTE

After the Siags essentially refused any contact with King & Spalding following their secret settlement with Egypt, *see id.*, King & Spalding filed an arbitration against them on December 10, 2009 before the LCIA. *See* Ex. 5 (Request for Arbitration). The arbitration clause at issue is very broad, being expressly "designed to encompass all possible disputes among the parties relating to [King & Spalding's] representation of [the Siags]." Ex. 1 art. 8. Among other claims for relief, King & Spalding brought claims against the Siags for breach of contract, conversion, and money had and received. *See* Ex. 5 at Part VII. These claims were the "first filed" claims in the dispute between King & Spalding and the Siags, and they were appropriately filed before the LCIA because the parties' Contract of Representation requires that "[t]he arbitration shall be conducted in accordance with the Arbitration Rules of the London Court of International Arbitration." Ex. 1 art. 8. All of the Siags acknowledge signing the Contract of Representation. *See* Ex. 1; Affidavit of Waguih Siag ¶¶ 6, 8 (on file).

Subsequently, on January 11, 2010, and in violation of their contractual agreement to arbitrate, the Siags filed a lawsuit in state district court in Harris County, Texas against King &

Spalding and its lead partner in the ICSID arbitration, Mr. Reggie Smith. *See* Ex. 6. The claims made in that lawsuit are essentially counterclaims to King & Spalding's arbitration claims against the Siags. King & Spalding removed the Siags' state court lawsuit to federal court, *see* Dkt. No. 1 in Civil Action No. 4:10-cv-367, and filed a motion to compel arbitration, *see* Dkt. No. 2 in Civil Action No. 4:10-cv-367. King & Spalding's motion to compel arbitration is fully brief by all sides, and it is pending a decision from this Court. Importantly, the claims at issue in King & Spalding's motion to compel arbitration ***are not*** the affirmative claims King & Spalding has brought against the Siags before the LCIA. King & Spalding's claims against the Siags were originally and properly brought before the LCIA pursuant to the arbitration clause in the parties' Contract of Representation, and any objection the Siags might have to the LCIA's jurisdiction regarding those claims can and must be brought before the LCIA (as will be discussed in more detail later in this brief). Rather, the only claims at issue in King & Spalding's motion to compel arbitration are the Siags' "counterclaims" against King & Spalding that were originally filed in Texas state court.

## III.   GOVERNING LAW, LEGAL STANDARD, AND BURDEN OF PROOF TO OBTAIN INJUNCTIVE RELIEF

### A.   The Provisions of the Federal Arbitration Act, Not the Texas Arbitration Act, Apply

Plaintiffs repeatedly cite to Texas law and the Texas Arbitration Act (TAA) found in the Texas Civil Practice and Remedies Code. *See generally* Plaintiffs' Application and Memorandum *passim*. However, the arbitration agreement among the parties falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as briefed by Defendants in their Amended Notice of Removal in Civil Action No. 4:10-cv-2096, *see* Dkt. No. 15 at 4-8, and in both their Notice of Removal and Motion to Compel Arbitration in this action, *see* Dkt. Nos. 1 & 2 in Civil Action No. 4:10-cv-367. Accordingly, the Convention's provisions

and procedures, and those it incorporates from the Federal Arbitration Act (FAA) regarding vacating awards and staying arbitrations, apply to this proceeding—not the TAA.   Moreover, even if the Convention were not to apply—which it does—the same vacatur and stay procedures from the FAA would remain applicable because the Contract of Representation "involves interstate commerce."

Under the Convention, the FAA's enforcement, vacatur, and stay provisions apply.   On questions of annulment, courts of primary jurisdiction apply "the country's domestic arbitral law."   *See Gulf Petro Trading Co., Inc. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 746 (5th Cir. 2008).   In the United States, the "domestic arbitral law" is the FAA.   For instance, in *In re Arbitration Between Trans Chemical Ltd. and China Nat'l Machinery Import and Export Corp.*, a Pakistani corporation sought to enforce an arbitration award against a Chinese corporation that had been awarded in a binding arbitration in Houston under the procedures of the American Arbitration Association.   978 F. Supp. 266, 271 (S.D. Tex. 1997).   The court held that, because the arbitration award at issue was "between two foreign parties," the Convention applied.   *Id.* at 297.   It then rejected application of the Texas Arbitration Act—even though it was relied on by both parties—and applied the FAA's vacatur provision because "[u]nder the Supremacy Clause of the United States Constitution the FAA preempts all otherwise applicable state laws, including the TGAA" whenever the arbitration agreement is contained in "a contract evidencing a transaction involving commerce."   *Id.* at 302; *see also In re Nationwide Credit, Inc.*, 2010 WL 596809, at *3 (Tex. App.—Corpus Christi 2010, no pet. h.).

Similarly here, the requisites for the Convention's application are met.   An arbitration agreement falls under the Convention when "(1) there is an agreement in writing to arbitrate the dispute, (2) the agreement provides for arbitration in the territory of a Convention signatory, (3)

6

the agreement arises out of a commercial legal relationship, and (4) a party to the agreement is

not an American citizen." *LIM v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 903 (5th

Cir. 2005). The Contract of Representation and the arbitration provision therein are written. *See*

Ex. 1 art. 8 (Contract of Representation). The provision provides that the situs of the arbitration

shall be in Houston, Texas, U.S.A., *see id.*, and the United States is a signatory to the

Convention, *see Beiser v. Weyler*, 284 F.3d 665, 666 n.2 (5th Cir. 2002). Plaintiff Waguih Siag,

a party to the Contract of Representation, is a citizen of Lebanon and Italy. *See* Dkt. No. 15, Ex.

5 ¶ 4.[5]

Regarding the Convention's third requirement—which is also the sole requirement for

the FAA to apply—the Contract of Representation indisputably evidences a transaction

involving commerce. Courts interpret "commercial" in the arbitration context as extending "to

the limits of Congress' Commerce Clause power." *Allied-Bruce Terminix Cos. v. Dobson*, 513

U.S. 265, 268 (1995). The Seventh Circuit has explained: "That the requirement that an

arbitration agreement involve commerce is not a limitation but a qualification suggests that

Congress intended the FAA to apply to all contracts that it constitutionally could regulate."

*Synder v. Smith*, 736 F.2d 409, 418 (7th Cir. 1984), *overruled on other grounds, Flezen v.

Andreas*, 134 F.3d 873 (7th Cir. 1998).[6] Specific to this case, a contract to provide legal services

in exchange for compensation is plainly commercial. *See McGuire, Cornwell & Blakely v.*

---

[5] Plaintiffs Touristic Investment & Hotels Management Company (SIAG) S.A.E. and Siag-Taba Company are companies incorporated under the laws of Egypt. *See* Dkt. No 15, Ex. 5 ¶ 4. The remaining signatories to the arbitration agreement (other than King & Spalding) are also not United States citizens. *See id.*

[6] *See also Mesa Operating Ltd. P'Ship v. La. Intrastate Gas Corp.*, 797 F.2d 238, 243 (5th Cir. 1986) ("Commerce under the FAA . . . includes all contracts 'relating to interstate commerce.'").

*Gride*, 765 F. Supp. 1048, 1050 (D. Colo. 1991) ("It is uncontested that the fee agreements [between lawyer and client] evidence a transaction involving interstate commerce.").[7]

In sum, because this case involves a commercial contract with a foreign party which contains a binding arbitration clause, the FAA's provisions apply as incorporated under the Convention. Moreover, these same provisions apply notwithstanding the Convention simply because the arbitration agreement is part of a contract involving interstate commerce.

### B.   Evidentiary Elements Plaintiffs Must Show to Obtain Injunctive Relief

Under federal law, "[i]n order to secure an injunction, the movant must show: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *City of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 527 (5th Cir. 1983).

## IV.   PLAINTIFFS DO NOT AND CANNOT SATISFY THE ELEMENTS FOR INJUNCTIVE RELIEF AS A MATTER OF LAW

Even assuming the validity of the Siags' vaguely alleged exigent circumstances allegedly supporting injunctive relief, which Defendants vigorously dispute as set forth in Part V *infra*, the Siags cannot meet their evidentiary burden as a matter of law regarding their requests that Defendants be enjoined from (1) proceeding with the currently pending LCIA arbitration, (2)

---

[7] Moreover, this preemption analysis remains unchanged even when a commercial contract's arbitration clause contains a choice-of-law provision favoring state law. In *Roehrs v. FSI Holdings, Inc.*, the arbitration agreement's choice-of-law provision designated Texas law. *See* 246 S.W.3d 796, 803 (Tex. App.—Dallas 2008, pet. denied). Nevertheless, the Court held that the FAA applied over the TAA, noting that "the Texas Supreme Court has held that a choice-of-law clause will not be construed to select the TAA to the exclusion of the FAA unless the clause 'specifically excludes the application of federal law.'" *Id.* (quoting *In re L & L Kempwood Assocs., L.P.*, 9 S.W.3d 125, 127-28 (Tex. 1999) (per curiam)). Thus, in *Roehrs*, while state law applied to the substantive claims in the arbitration, the court applied the FAA's vacatur provision in its review of the arbitration award. *See id.* at 805-06.

enforcing the Interim Order issued by the LCIA Tribunal, and (3) contacting Plaintiffs' current and prospective business partners and associates regarding the Interim Order.

### A.       Plaintiffs' Request To Stay the LCIA Arbitration Proceedings

The Siags wholly fail to meet the last three elements required to obtain an injunction staying the LCIA arbitration proceedings.  First, under federal law, no irreparable injury stems from not staying arbitration.  Myriad federal cases make this point.  For instance, in *City of Meridian*, a dispute arose between the city and its general contractor over the construction of a wastewater treatment plant.  *See* 721 F.2d at 526-27.  The contractor filed a demand for arbitration with the American Arbitration Association; the city filed a lawsuit.  *See id.*  In the city's lawsuit, the district court granted the city's motion to stay the arbitration pending litigation.  *Id.*  On appeal, the Fifth Circuit reversed the stay, holding:

> [T]he district court found that the City would suffer irreparable injury if Blair were allowed to proceed to arbitration.  We disagree.  Even if the parties were ordered to begin arbitration, the City could continue to challenge the claim to the arbitrator and to the courts if there was an unfavorable decision.  If a legal challenge proved successful, the City obviously would not be bound by the findings or conclusions of the arbitrator.  Although the City may have to suffer the expense of inappropriate arbitration, such expenditures do not constitute irreparable harm.  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."

*Id.* at 529 (quoting *Deerfield Medical Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)).  Thus, even should arbitration prove inappropriate, established legal procedures provide for redress through the court system through which injury can be undone by monetary remedies.  This reasoning eschewing irreparable injury absent an arbitration stay is echoed by courts around the country.[8]

---

[8]  *See Encompass Power Servs., Inc. v. Eng'g & Constr. Co.*, 2005 WL 3234369, at *2 (S.D. Tex. 2005) ("ECCO has failed to demonstrate that it will suffer irreparable harm if the stay is not granted. . . .  If the scheduled arbitration results in an award against ECCO, that award can be challenged in a proceeding to vacate the arbitration award.  ECCO argues that it would be forced to incur 'the horrible and irretrievable

Second, any potential injury that a stay could avoid does not outweigh the harm that staying the arbitration would cause to Defendants. As the Fifth Circuit explained in *City of Meridian*: "Even if [the contractor] ultimately wins in court and the issue returns to arbitration [post-stay], the expense and delay of court action will deprive [the contractor] of a significant portion of its bargain. . . . That is a major reason why injunctions staying arbitrations are viewed with disfavor." 721 F.2d at 529.

Third, staying arbitration disserves the public interest. Here, as in *City of Meridian*, "in light of the strong federal policy favoring arbitration over litigation, 9 U.S.C. §§ 1 et seq., . . . the public interest would be thwarted by an injunction against arbitration on these facts." *Id.*; *see also Encompass Power Srvs.*, 2005 WL 3234369, at *2 (quoting *City of Meridian*); *Medcam*, 2004 WL 1790184, at *3 ("[P]ublic policy favors a finding of arbitrability in the face of doubt.").

Accordingly, as a matter of law, Plaintiffs cannot show irreparable injury, that their injury outweighs the threatened injury to Defendants from a stay, and that staying arbitration does not disserve the public interest. This Court should deny Plaintiffs' motion for an injunction staying the pending LCIA arbitration.

### B.   Plaintiffs' Request To Stay Enforcement of the Interim Order

The Siags' request to stay Defendants from enforcing the LCIA Tribunal's Interim Order also fails to meet the required elements for injunctive relief. In fact, the Siags fail at the first

---

expense in excess of $200,000.00.' . . . The expense of an inappropriate arbitration does not, however, constitute irreparable harm."); *Graphic Commc'ns Union v. Chicago Tribune Co.*, 779 F.2d 13, 15 (7th Cir. 1985) ("[T]he cost of the arbitration, whether it is an opportunity cost of time or an out-of-pocket expense for lawyers or witness fees or whatever, or both types of costs, does not show irreparable harm. Otherwise every order to arbitrate would be deemed to create irreparable harm, and it would be easy to get such orders stayed."); *Medcam Inc. v. MCNC*, 2004 WL 1790184, at *2 (D. Minn. 2004) ("The Court is unpersuaded that MCNC will be irreparably injured. The issue for the arbitrator is whether MCNC is liable to MedCam under the Agreement. If the arbitrator finds in favor of MedCam, MCNC will nonetheless have the right to appeal this decision. Moreover, if MCNC secures a reversal of this Court's order, the arbitration proceedings would be in effect, void.").

element because on-point case law forecloses any likelihood of success on the merits. Without citing applicable federal law, the Siags attempt to support a likelihood of success on the merits by alleging that the LCIA Tribunal "showed evident partiality, exceeded his powers, and refused to postpone the hearing despite sufficient cause." Plaintiffs' Memorandum at 31. Each of these arguments is completely refuted below.

Plaintiffs' likelihood-of-success-on-the-merits argument faces a steep, uphill battle from the start. "The FAA narrowly restricts judicial review of arbitrators' awards"; it is a "draconian remedy" available only under limited statutory or common law exceptions. *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278, 280, 286 (5th Cir. 2007). Under § 10 of the FAA, there are only four statutory bases for vacatur, and the Fifth Circuit recognizes two additional common law grounds: "manifest disregard of the law" and "contrary to public policy." *Sunguard Energy Sys. Inc. v. Gas Transmission Northwest Corp.*, 551 F. Supp. 2d 608, 612 (S.D. Tex. 2008); 9 U.S.C. § 10(a) (enumerating grounds for vacatur: (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, . . . (4) where the arbitrators exceeded their powers, . . . ."). Both the breadth and depth of judicial review is limited. "To assure that arbitration serves as an efficient and cost-effective alternative to litigation, and to hold parties to their agreements to arbitrate, judicial review of an arbitrator's award under these statutory or common-law grounds is exceedingly narrow. The court resolves ***all doubt*** in favor of arbitration." *Sunguard Energy*, 551 F. Supp. at 612 (emphasis added) (internal citations omitted).

### 1. No court could rule that the Arbitral Tribunal showed "evident impartiality" under the FAA (9 U.S.C. § 10 (a)(2))

The Siags make weak allegations of Defendants' ties with the LCIA, ranging from Defendants having a partner that serves as a member on the LCIA Court—who, by LCIA policy, is not remotely involved with this arbitration—to the fact that the president of the LCIA—also not involved in this arbitration—is conflicted, to a last-ditch-effort allegation that international arbitration as a whole is a "boys club." *See* Plaintiffs' Memorandum at 17-20.

None of these alleged "connections" even approach the level of partiality required to vacate an arbitral award. Courts have refused vacatur where the connections are much stronger. *See, e.g., Montez v. Prudential Sec., Inc.*, 260 F.3d 980, 982, 984 (8th Cir. 2001) (no vacatur when, as general counsel for a company, the arbitrator had employed sixty-eight attorneys, paying them $2.8 million in fees, from the law firm representing one of the parties in the arbitration); *ANR Coal Co., Inc. v. Cogentrix of N.C., Inc.*, 173 F.3d 493, 495-96 (4th Cir. 1999) (no vacatur when arbitrator's law firm represented company that indirectly caused the dispute in the arbitration by buying less from the defendant, who in turn sought to buy less from the plaintiff); *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 682 (D.C. Cir. 1996) (no vacatur when the arbitrator's former law firm represented a party to the arbitration on unrelated matters).[9]  In light

---

[9]  *See also, e.g., Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 432-34 & n.3 (11th Cir. 1995) (no vacatur when the arbitrator had memorialized a prior scheduling dispute with an attorney from the law firm representing one of the parties and mentioned it eighteen months later at the arbitration; arbitrator also failed to disclose that he became "of counsel" to a law firm the prevailing party had interviewed for the purpose of obtaining representation in the instant dispute and that he had reviewed the contract involved in the case two years prior; court found this, at best, showed a "remote, uncertain, and speculative partiality"); *Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1255, 1264 (7th Cir. 1992) (no vacatur when the arbitrator knew one of the parties, had worked in the same office with him twenty years ago, and saw him about once a year since; the court found this relationship "minimal" and insufficient to vacate); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 677, 680 (7th Cir. 1983) (no vacatur when the arbitrator had worked directly under the president and principal stockholder of one of the parties for three years, ending fourteen years prior to the arbitration; the Seventh Circuit noted that "[t]ime cools emotions, whether of gratitude or resentment"); *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1149-50 (10th Cir. 1982) (no vacatur when the arbitrator and law firm representing a party had clients in

of these cases, the high standard for vacating an arbitral award, and the federal policy favoring arbitration, Plaintiffs' "evident partiality" argument is exceedingly unlikely to succeed on the merits.

### 2. No court could rule that the Arbitral Tribunal "exceeded its powers" under the FAA (9 U.S.C. § 10(a)(4))

The Siags assert that the LCIA Tribunal exceeded its powers by "requiring Movants to pay Respondents a $60 million first-class London bank guaranty." Plaintiffs' Memorandum at 31. The Siags' description of the Interim Order is factually inaccurate. *See infra* at 28 n.10. In short, as the Interim Order makes clear, the Siags were required to post—not pay—a first-class London bank guarantee payable on "presentation of an arbitration award in favor of [King & Spalding]." Ex. 7 ¶ 25(D) (Interim Order). King & Spalding is wholly entitled to at least this relief based on the Contract of Representation, which required that "any payment of a settlement or judgment by Egypt shall be made into a client escrow account maintained by K&S." Ex. 1 art. 2. Pursuant to this clause, the entire $80 million settlement amount should be in an escrow account pending resolution of this dispute. *See id.*; *see also infra* at 28 n.10. Requiring that the Siags post a $60 million bank guarantee did nothing more than put King & Spalding in a position closer to—but still worse than—that for which it had contracted.

The LCIA Tribunal did not exceed its power by trying to enforce some semblance of the contractual status quo. *See infra* Part V(A)(3) (setting forth the Tribunal's express powers in detail). Even when arbitrators *exceed* contractual limits, courts in this circuit refrain from vacating arbitral awards. In *Dole Ocean Liner Express v. Georgia Vegetable Co.*, the arbitration panel awarded a party "damages in excess of the amount provided for in the liquidated damages

---

common; requiring vacatur under such facts would "request that potential neutral arbitrators sever all their ties with the business world" (internal quotation omitted)).

clause in the contract"—awarding $665,113.06 rather than the liquidated damages amount of $31,000. *See* 84 F.3d 772, 773-74 (5th Cir. 1996). The contractual counterparty sought to vacate the award, asserting that the arbitration panel exceeded its powers. *See id.* at 774. Reiterating that it must "resolve all doubts in favor of arbitration," the Fifth Circuit applied this extreme deference by holding that, "[w]hatever our belief about the enforceability of the liquidated damages clause may be, it is clear that the arbitration panel had the power to determine that it was not a reasonable pre-estimate of damages and therefore void." *Id.*

Here, the LCIA Tribunal ordered the Siags to post a guarantee less than—not in excess of—the security King & Spalding remains entitled to under the Contract of Representation. Comparing this case to *Dole Ocean Liner*—where, despite an arbitral award exponentially in excess of a clear contractual limit on liability, the court strained to avoid overriding arbitration—makes untenable the assertion that the LCIA Tribunal exceeded its power here.

### 3. No court could rule that the Arbitral Tribunal was "guilty of misconduct in refusing to postpone the hearing" under the FAA (9 U.S.C. § 10(a)(3))

Plaintiffs argue that the LCIA Tribunal should have postponed the Interim Order hearing until after this Court ruled on King & Spalding's motion to compel arbitration of the Siags' Texas state court "counterclaims" against King & Spalding. As discussed in Part V(A)(1) *infra*, the LCIA Tribunal has independent authority to determine its own jurisdiction over King & Spalding's first-filed claims against the Siags. Therefore, there was no reason for the Tribunal to await a ruling on the arbitrability of the Siag's Texas state court claims against King & Spalding.

Nevertheless, to vacate an arbitral award, a court must find that the arbitrator "lacked any reasonable basis" for not postponing a hearing. *See Sungard Energy Sys. Inc. v. Gas Transmission Northwest Corp.*, 551 F. Supp. 2d 608, 613 (S.D. Tex. 2008). As the LCIA Tribunal's Interim Order makes clear, the purpose behind the Interim Order was to "provide

14

security so that should any award go against Respondents after a full hearing on the merits, any award is not rendered ineffective and nugatory through disposal of the settlement proceeds in the meantime. There is on the evidence a risk of irreparable harm if interim relief is not granted." Ex. 7 ¶ 23. In other words, time was of the essence in providing the security. This surely suffices as "any reasonable basis" for not postponing the hearing. *Sungard*, 551 F. Supp. 2d at 613 & n.11 (finding a reasonable basis for denying a continuance where "the panel had indicated that the date of the hearing was firm" and the panel might have wanted to "ensure that arbitration served its intended purpose").

Moreover, even in a case where the arbitrator's decision lacked any reasonable basis for not postponing a hearing, the movants must still show that they "suffered prejudice because of that refusal." *Id.* at 613. Prejudice in this context requires the movants to prove that "a continuance might have altered the outcome of the arbitration." *Id.* The Siags have not and cannot prove that had the Interim Order hearing occurred later, the outcome would have been different. Rather, the Siags have time and again affirmatively stated their refusal to participate in the LCIA arbitration. *See* Exs. 18, 20, 27, 28, 30, 32, 35, 41. Thus, there was nothing they would have filed or evidence they would have raised had the hearing been postponed. Plaintiffs cannot prove a likelihood of success of having the Interim Order vacated.

### C. Plaintiffs' Request To Prohibit Defendants From Contacting Plaintiffs' Current and Prospective Business Partners and Associates Regarding the Interim Order Is Constitutionally Barred

The Siags provide no evidentiary basis for their request to prohibit Defendants from contacting the Siags' current and prospective business partners and associates regarding the Interim Order other than to suggest that such contacts have taken place (without any specificity or detail) and to state without any evidentiary support that they will be irreparably harmed by such contacts. *See* Affidavit of Waguih Siag ¶¶ 32, 33. Needless to say, this type of vague

allegation does not meet the required elements for emergency injunctive relief. But even if the Siags had more evidence to offer—which they do not—the requested restraint on speech is plainly barred by well established legal precedent.

In *Organization for a Better Austin v. Keefe*, the United States Supreme Court made clear that imposing a "prior restraint on speech and publications constitutes an impermissible restraint on First Amendment rights." 91 S. Ct. 1575, 1577 (1971). In so ruling, the Supreme Court emphasized that courts must not concern themselves with either "the truth or validity of the publication" or the allegation that "the expressions were intended to exercise a coercive impact," because such evidence "does not remove [the speech] from the reach of the First Amendment." *Id.* at 1577-78. As the Supreme Court concluded, "[n]o prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices . . . warrants use of the injunctive power of a court." *Id.* at 1588; *see also In re Nat'l Serv. Corp.*, 742 F.2d 859, 862 (5th Cir. 1984) ("The Supreme Court, in a plethora of cases, has held that prior restraints come before the Court with a 'heavy presumption' against their constitutional validity."). Under this precedent, and based upon the lack of evidence proffered, the Siags' requested injunction not only comes with a "heavy presumption" against it, it is plainly constitutionally barred.

## V.   PLAINTIFFS' PROFERRED EXIGENT CIRCUMSTANCES ALLEGEDLY JUSTIFYING INJUNCTIVE RELIEF ARE EQUALLY INSUFFICIENT AND FAIL TO MEET THE SIAG'S BURDEN OF PROOF

### A.   The Siags' Arguments in Their TRO Motion

In their TRO Motion, the Siags offer three "exigent circumstances" that allegedly entitle them to injunctive relief. None of them is even close to sufficient to obtain such extraordinary relief.

### 1.      The continuation of the LCIA arbitration proceeding

The Siags argue that King & Spalding "intend[s] to proceed with the LCIA arbitration despite the pending decision [by this Court] upon [King & Spalding's] motion to compel arbitration . . . which will necessarily determine the arbitrability of the matter and the LCIA's jurisdiction." TRO Motion at 3. This argument makes no sense, and it is certainly no basis for injunctive relief. There are two separate sets of claims here. The first set of claims is the "first filed" claims filed by King & Spalding against the Siags in December 2009 before the LCIA. The second, separate set of claims is the claims filed by the Siags against King & Spalding and Mr. Smith in January 2010 in Texas state court. The Siags' claims are essentially counterclaims to King & Spaldings's "first filed" LCIA claims, although they obviously stand as independent claims in their own right. This Court is not deciding whether to compel arbitration of the "first-filed" set of claims (that is, King & Spalding's claims against the Siags already before the LCIA). Rather, she is only deciding—if for no other reason than that it is the only motion before her—whether to compel arbitration of the second set of claims (that is, the Siags' claims against King & Spalding and Smith that were removed from Texas state court). Thus, it is simply not that case that the continuation of the LCIA arbitration proceeding could or does cause any harm to the Siags. They need to appear and defend those claims in the forum in which they were (appropriately) filed, or they may elect not to appear and then contest enforcement of any award granted by the LCIA Tribunal. In either case, there is no irreparable injury from having to participate in an arbitration proceeding. *See supra* Part IV(A). And there is an adequate remedy at law even if such participation is without jurisdiction because either the Siags can appear and defend (including contesting jurisdiction) or, whether they choose to appear and defend or not, they may contest any enforcement action King & Spalding might bring based on a final merits award. *See id.*

When the Siags signed the Contract of Representation, they knew that it called for "[t]he arbitration [to] be conducted in accordance with the Arbitration Rules of the London Court of International Arbitration." Ex. 1 art. 8; *see also* Affidavit of Waguih Siag ¶¶ 6, 8.  Article 23 of the LCIA Arbitration Rules has specific provisions regarding challenging the jurisdiction of the arbitral tribunal.  *See* Ex. 8 art. 23 (LCIA Arbitration Rules).

> 23.1    The Arbitral Tribunal shall have the power to rule on its own jurisdiction, including any objection to the initial or continuing existence, validity or effectiveness of the Arbitration Agreement. . . .
> 
> . . .
> 
> 23.4    By agreeing to arbitration under these Rules, the parties shall be treated as having agreed not to apply to any state court or other judicial authority for any relief regarding the Arbitral Tribunal's jurisdiction or authority . . . .

*Id*. The Siags violated both of these rules in applying to this Court for injunctive relief regarding King & Spalding's LCIA claims (as opposed to the Siags' Texas state court claims). Furthermore, despite their blatant violation of those rules, because of the nature of a motion to compel arbitration, this Court will indeed be considering the Siags' jurisdictional objections regarding their "counterclaims."  None of this, however, effects King & Spalding's first-filed claims against the Siags, which have never been filed in any Texas court but rather were originally (and appropriately) filed with the LCIA.  The LCIA Arbitration Rules clearly provide that the Siags can, should, and must bring any jurisdictional objections to those claims before the LCIA.  *See id*.  In fact, the LCIA Tribunal (composed of a sole arbitrator, Mr. Steven Gee QC) has repeatedly invited the Siags to formally brief their jurisdictional objections so that he may rule on them.  *See* Exs. 21; Ex. 24; Ex. 25; Ex. 33 ¶ 3(b); Ex. 34 ¶ 11.  They have declined to so. *See* Ex. 38 ¶ 3; Ex. 42 ¶ 3.

In any event, despite the Siags' refusal to formally brief their jurisdictional objections to the LCIA Tribunal, the Tribunal nonetheless assumed on their behalf that they would at least

assert similar jurisdictional objections to those lodged in Texas court, and it required King & Spalding to respond to those arguments. *See* Ex. 7 ¶ 19(i) (Interim Order). King & Spalding filed its Submission on Jurisdiction on April 12, 2010. *See* Ex. 17. The Siags declined to file their brief in response by May 10, 2010 as ordered by the LCIA Tribunal. *See* Ex. 7 ¶ 19(ii); Ex. 38 ¶ 3; Ex. 42 ¶ 3.

There is no emergency here. There is only the Siags' continuing efforts to avoid their prior agreement to arbitrate and to have their jurisdictional objections to King & Spalding's claims heard by a court where those claims were not filed and are not at issue, all in direct violation of the LCIA Arbitration Rules to which they agreed.

### 2. The LCIA hearing allegedly to be scheduled between June 21 and July 9, 2010

The Siags argue that the LCIA Tribunal (Mr. Gee) will be scheduling a hearing between June 21 and July 9 and, at that hearing, he will decide matters "without consideration of the Houston Federal Court's pending decision on this issue or the application of controlling Texas law." TRO Motion at 3; *see also* Plaintiffs' Memorandum at 5. Quite frankly, this statement is astounding. There is currently no hearing scheduled before the LCIA Tribunal until August 9-10, 2010, when the jurisdictional objections of Mr. Rami Siag—who is not a party to this lawsuit but is Plaintiff Waguih Siag's brother—will be considered. *See* Ex. 45 (LCIA Tribunal's Briefing Schedule Order). Mr. Rami Siag chose to formally brief his jurisdictional objections, and the LCIA Tribunal has established a briefing scheduled for those issues. *See id*. There is no imminent, irreparable injury here. And even if a hearing were held, the Siags (as previously noted) have the right to appear and defend (including on the basis of lack of jurisdiction, as repeatedly invited to do by the LCIA Tribunal) or contest any award after the Tribunal might issue in their deliberate absence at any subsequent enforcement proceeding.

Furthermore, this Court's decision regarding the arbitrability of the Siags' Texas state court "counterclaims" against King & Spalding will not conclusively answer any objections to the arbitrability of King & Spalding's LCIA claims against the Siags. First, that question is not before this Court. Second, as Article 23 of the LCIA Arbitration Rules makes clear (as quoted above), the LCIA Tribunal—as an independent adjudicatory authority properly constituted— must decide for itself any issues regarding its jurisdiction over King & Spalding's LCIA claims against the Siags. The only issue before this Court is whether to compel the Siags' Texas state court "counterclaims" against King & Spalding to arbitration. As a consequence, there is no emergency requiring an injunction to stop the LCIA Tribunal from performing the very jurisdictional task that its rules mandate and require that it do. *See* Ex. 8 art. 23 (LCIA Arbitration Rules regarding jurisdiction)

### 3.    Efforts to enforce the LCIA Tribunal's Interim Order, which Order is alleged to exceed the Tribunal's powers

The Siags argue that King & Spalding is taking "aggressive steps" to enforce the LCIA Tribunal's Interim Order awarding King & Spalding certain interim relief. TRO Motion at 3; *see also* Plaintiffs' Memorandum at 3-4, 12-15. The Siags make this argument without providing any evidence as to what those "aggressive" steps are, but in any event, King & Spalding is entitled to enforce the Interim Order and intends to do so. Article 25 of the LCIA Arbitration Rules expressly provides for the awarding of interim and conservatory measures. *See* Ex. 8 art. 25. In particular, Article 25 provides that the "Arbitral Tribunal *shall have the power*":

    (a)    to order any respondent party to a claim . . . to provide security for all or part of the amount in dispute, by way of deposit or bank guarantee or in any other manner and upon such terms as the Arbitral Tribunal considers appropriate. . . .

    (b)    to order the preservation, storage, sale or other disposal of any property or thing under the control of any party and relating to the subject matter of the arbitration; and

(c)     to order on a provisional basis . . . any relief which the Arbitral Tribunal
would have power to grant in an award, including the provisional order for
the payment of money or the disposition of property as between any
parties.

*Id.* (emphasis added); *see also id.* art. 22.1(d)-(e).  A simple review of the LCIA Tribunal's

Interim Order, *see* Ex. 7 ¶¶ 20-25, establishes that there is nothing in that Order outside of the

authority granted to the Tribunal by Article 25.  The grounds for that Interim Order were well

founded as set forth in King & Spalding's written request that it be granted.  In fact, regarding

the monetary security sought by King & Spalding as an interim conservatory measure under

Article 25, the Tribunal ordered less than the amount and form requested by King & Spalding, so

there can be no argument that the Tribunal was not using its powers to award appropriate interim

relief in a considered manner.[10]

The parties' Contract of Representation expressly states that "[t]he arbitration shall be

conduced in accordance with the Arbitration Rules of the London Court of International

Arbitration."  Ex. 1 art. 8.  In turn, the LCIA Arbitration Rules state that: "Where any agreement

. . . provides . . . for arbitration under the rules of the LCIA or by the Court of the LCIA . . . , the

parties shall be taken to have agreed in writing that the arbitration shall be conducted in

---

[10]  King & Spalding had requested that the entire amount of the Siags' settlement with Egypt be escrowed *__as required by__* the parties' Contract of Representation.  *See* Ex. 1 art. 2 ("The parties agree that any payment of a settlement . . . by Egypt shall be made into a client escrow account maintained by [King & Spalding].  [King & Spalding's] fee interest pursuant to paragraph 2 and expense reimbursement pursuant to paragraph 3 of this Contract will be deducted and the balance shall be wire transferred to [the Siags] pursuant to [their] written instructions.").  Instead, the Tribunal ordered the Siags' to post a $60 million first-class London bank guarantee.  *See* Ex. 7 ¶ 25(D).  In their briefing to this Court, the Siags attempt to couch this guarantee as "a final Order/Award requiring [the Siags] *to pay* $60 million to [King & Spalding]."  Plaintiffs' Memorandum at 3 (emphasis added).  That is simply not true.  The Interim Order is for a bank guarantee, not a cash payment.  *See* Ex. 7 ¶ 25(D).  Plaintiffs also tell this Court that the guarantee provides King & Spalding a "bank guaranty payable by the bank on written demand by [King & Spalding] *without restriction* on their ability to request payment thereon," Plaintiffs' Memorandum at 12 (emphasis added), without noting that no draw could be made on the guarantee without "presentation of *an arbitration award* in favor of [King & Spalding]" issued by the LCIA Tribunal, Ex. 7 ¶ 25(D) (emphasis added).

accordance with the following rules . . . ." Ex. 8 at Preamble. While it is true that the parties'
Contract of Representation also states that "[t]he rights and obligations of the parties to this
Contract shall be governed by Texas law," Ex. 1 art. 7, that does not trump or restrict the
applicability of the LCIA Arbitration Rules.

Taking the opposite position, the Siags argue that "Arbitrator Gee made no attempt to
apply Texas law before issuing" the Interim Order. Plaintiffs' Memorandum at 13. First, this is
not at all clear from the Interim Order, which references the usual elements for injunction relief,
*see* Ex. 7 ¶ 23, required for presuit conservatory measures, *see, e.g., Williams Indus., Inc. v.
Fry's Elecs., Inc.*, 2003 WL 21357441, at *5 (Tex. App.—Houston [1st Dist.] 2003, no pet.).[11]

Second, and more importantly, the United States Supreme Court has made clear that a
choice-of-law clause in an arbitration agreement otherwise governed by the rules of an
arbitration association cannot trump or restrict the scope of those arbitration rules. *See
Mastrobuono v. Shearson Lehman Hutton, Inc.*, 115 S. Ct. 1212 (1995). In *Mastrobuono*, the
parties' contract had a New York choice-of-law clause, but it also had an arbitration clause
which stated that "'any controversy' arising out of the transactions . . . 'shall be settled by
arbitration' in accordance with the rules of the [NASD]." *Id.* at 1216-17 & n.2. The defendant

---

[11]   The Houston First Court of Appeals approved the following reasoning for affirming a temporary
injunction requiring the defendant to deposit all of its assets into an escrow account:

> The credible evidence also shows that unless Williams is immediately enjoined
> from dissipating or diverting the assets involved in this lawsuit, Williams will dissipate or
> divert such assets and will alter the status quo and hinder the Court in the granting of
> appropriate relief. Unless Williams is immediately enjoined from dissipating or diverting
> the assets involved in this lawsuit, Fry's will be without an adequate remedy at law, will
> suffer probable and irreparable injury, and will suffer imminent harm in that, among
> other things, Williams will be judgment-proof and insolvent, will likely become an
> "empty shell" company, and the assets that may be awarded to Fry's will become
> difficult, if not impossible, to account for and recover.

*Id.* at *5. These same concerns were a large part of King & Spalding's argument to the LCIA Tribunal
for an interim order, and the Tribunal's Interim Order shows that he found them meritorious. *See* Ex. 7 ¶¶
20-25 (Interim Order).

argued that the arbitral tribunal improperly awarded punitive damages because they were barred by New York law (even if permitted by the NASD's arbitration rules). *See id.* at 1214, 1216-17. The Supreme Court disagreed:

> [W]hen read separately this clause strongly implies that an arbitral award of punitive damages is appropriate. It explicity authorizes arbitration in accordance with NASD rules . . . . The NASD's Code of Arbitration Procedures indicates that arbitrators may ward 'damages and other relief.'
>
>     . . .
>     . . . We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration . . . . In contrast, respondents' reading sets up two clauses in conflict with one another: one foreclosing punitive damages, the other allowing them. This interpretation is untenable.

*Id.* at 60-61, 63-64 (citations and footnotes omitted). The same situation applies here. The Contract of Representation's choice-of-law clause expressly governs by its own terms the "rights and obligations" of the parties, Ex. 1 art. 7, but that cannot restrict the broad-based powers to award interim and conservatory measures granted by the LCIA Arbitration Rules, *see* Ex. 8 art. 25 (stating that "[t]he Arbitral Tribunal ***shall have the power***" to award three categories of broad-based interim relief (emphasis added)). In this way, there is no conflict between Texas law and the LCIA Arbitration Rules, just as the Supreme Court found there was no conflict between New York law and the NASD arbitration rules.

In summary, the Siags make no showing of any likely success on the merits of vacating the Interim Order as it was properly issued by the LCIA Tribunal pursuant to the powers granted by Article 25 of the LCIA Arbitration Rules. For the same reason, the Siags make no showing of irreparable injury as a consequence of King & Spalding's enforcement of that Interim Order. The Interim Order was properly issued, and even if it was not, the Siags have an adequate

remedy at law by their ability to fight enforcement in the courts of whatever jurisdiction King & Spalding might elect to seek enforcement.  Finally, in light of the LCIA Tribunal's finding of a danger that the Siags' are dissipating the settlement proceeds, *see* Ex. 7 ¶ 23 (Interim Order), the harm to King & Spalding of enjoining enforcement of the Interim Order would outweigh any harm to the Siags in light of the valid concern that the LCIA arbitration proceeding could be rendered nugatory if the Siags dissipate and/or hide all of the settlement proceeds prior to a final merits award (if any) being issued.

**B.     The Siags' Arguments in Their Application and Memorandum**

While it is unclear exactly what arguments in Plaintiffs' Application and Memorandum are meant to apply to the Siags' request for emergency injunctive relief, King & Spalding briefly addresses all of them because none satisfy any element necessary to obtain such relief.

**1.     Alleged partiality of certain members of the LCIA Court**

The Siags allege that the LCIA is partial because some members of the LCIA Court (the LCIA's governing body) have alleged conflicts with the Siags.  *See* Plaintiffs' Memorandum at 10-11, 18-21.  This allegation is distinct from the alleged partiality of the LCIA Tribunal itself, consisting of the sole arbitrator (Mr. Gee), which alleged conflict is addressed in the next section.

Even assuming the Siags had proffered any evidence of partiality on the part of any LCIA Court member, it would be irrelevant, and the issue has been fully briefed to the LCIA Tribunal (Mr. Gee) for his consideration.  *See* Ex. 17 at Part III(C) (King & Spalding's Submission on Jurisdiction).  None of the LCIA Court members about which the Siags complain have or will participate in the parties' LCIA arbitration proceeding, as repeatedly represented to the parties by the LCIA Registrar.  *See* Exs. 19, 29, 31; *see also* Ex. 17 at Part III(C).  This issue is a red herring.  Furthermore, as discussed in Part V(A)(1) *supra*, the LCIA Tribunal has jurisdiction to determine its own jurisdiction.  Thus, there is a process in place for the Siags to bring their

concerns to the *independent* LCIA Tribunal, *see* Ex. 9 (Mr. Gee's Statement of Independence), and the LCIA Tribunal has repeatedly asked the Siags to do so, *see* Ex. 7 ¶¶ 10-19; Ex. 24; Ex. 25; Ex. 33 ¶ 3(b); Ex. 34 ¶ 11; Ex. 40.  In any event, the Siags' complaints about the LCIA Court are hardly a ground for injunctive relief in light of the fact that the Siags have presented no conclusive evidence of an actual conflict.[12]

### 2.    Alleged partiality of the LCIA Tribunal itself (Mr. Gee)

The Siags also allege that Mr. Gee himself is partial.  *See* Plaintiffs' Memorandum at 11-12.  In this regard, they have requested the LCIA Court to remove him as the sole arbitrator handling King & Spalding's claims against the Siags.  *See* Exs. 35, 41.  The Siags tell the Court that "the LCIA refused to do so and instead left it up to Mr. Gee as to whether or not he could be impartial with predictable results."  Plaintiffs' Memorandum at 12.  This is simply not true. Pursuant to Article 10.4 of the LCIA Arbitration Rules, the LCIA was required to ask Mr. Gee if he intended to resign in light of the Siags' accusations.  *See* Ex. 8 art. 10.4; *see also* Exs. 36, 43. Mr. Gee declined to resign.  *See* Exs. 39, 44.  King & Spalding itself filed a letter with the LCIA Court explaining why the Siags' complaints are meritless.  *See* Ex. 37.  But the challenge to Mr. Gee remains under consideration by the LCIA Court, as Article 10 requires, and no final ruling has been issued.  *See* Ex. 43.[13]  Accordingly, there is no basis for finding any likelihood that Mr.

---

[12]  These alleged conflicts and the basis for them also form a key part of the Siags' opposition to King & Spalding's motion to compel arbitration.  *Compare* Plaintiffs' Memorandum at 10-11, 18-21 (the Siags' TRO arguments regarding the alleged partiality of certain members of the LCIA Court) *with* Ex. 10 at 23-26 (same arguments used to oppose King & Spalding's motion to compel arbitration).  *See generally* Exs. 13-16 (King & Spalding's response to those arguments).

[13]  The alleged partiality of the LCIA Tribunal and the basis for that allegation also form a key part of the Siags' opposition to King & Spalding's motion to compel arbitration.  *Compare* Plaintiffs' Memorandum at 11-12, 16, 31 (the Siags' TRO arguments regarding the alleged partiality of the LCIA Tribunal itself) *with* Ex. 12 at 6-8 (same arguments used to oppose King & Spalding's motion to compel arbitration).  *See generally* Exs. 13-16 (King & Spalding's response to those arguments).

Gee should be disqualified or that the LCIA Court will disqualify him.  Neither is there any danger of imminent, irreparable injury, as the issue is under advisement to the LCIA Court.

### 3.    Allegation that the LCIA Tribunal (Mr. Gee) exceeded its powers in issuing the Interim Order

In addition to arguing that the LCIA Tribunal exceeded its powers by the content of its Interim Order, which argument is addressed in Part V(A)(3) *supra*, the Siags also make certain procedural arguments regarding the Interim Order.

First, the Siags argue that the Tribunal issued its Interim Order "without a review of the merits or likelihood of successes on the merits of [the Siags'] claims" against King & Spalding. Plaintiffs' Memorandum at 4.  This is simply false.  The Tribunal expressly stated that it had read and reviewed all of the Siags' correspondence with the Tribunal as well as all of their filings in the Texas courts and taken them into account in issuing its Interim Order.  *See* Ex. 7 ¶¶ 5, 7, 10-14, 17-18, 20, 22 (Interim Order).

Second, the Siags argue that the hearing at which the interim relief issues were presented to the Tribunal was held "in absencia."  *See* Plaintiffs' Memorandum at 4.   First, the Siags were repeatedly invited to attend the March 30, 2010 hearing, *see* Exs. 21-25, had notice of it, *see* Ex. 7 ¶¶ 2-3, 9; Ex. 26 at 3-4; Ex. 38 ¶ 8, but refused to attend, *see* Ex. 7 ¶¶ 1-3 (Interim Order); Ex. 38 ¶ 8.  No hearing was held behind anyone's back.  Rather, the Siags simply decided to ignore the Tribunal.  If a party attempted similar behavior before a Texas state or federal court, it would undoubtedly receive a much harsher response than that issued by the LCIA Tribunal, which considered all of the Siags' arguments as best it could even in their absence, *see* Ex. 7 ¶¶ 5, 7, 10-14, 17-18, 20, 22 (Interim Order), and has continued to invite the Siags to participate in the arbitration proceeding, *see id.* ¶¶ 19, 25(G), 27; *see also* Ex. 33 ¶ 3(b); Ex. 34 ¶ 11.  In this regard, the LCIA Arbitration Rules give the Tribunal the power to fix hearing dates as well as

"the widest discretion to discharge it duties" as permitted under the Rules.  Ex. 8 arts. 14.2, 19.2.[14]

Third, the Siags argue that the Tribunal refused to stay the LCIA arbitration proceedings pending this Court's decision on King & Spalding's motion to compel arbitration.  *See* Plaintiffs' Memorandum at 4, 16.  As discussed in Part V(A)(1) *supra*, the LCIA Tribunal has the authority to determine its own jurisdiction over claims filed with the LCIA (that is, King & Spalding's claims against the Siags).  Just as a Texas state or federal court is not required to stay its proceedings because of a second filed lawsuit in another country, neither is the LCIA Tribunal required to stay its arbitration proceedings because of a second-filed lawsuit in Texas that concerns claims not on file in the LCIA arbitration proceeding (that is, the Siags' "counterclaims" against King & Spalding and Mr. Smith).  *See* Ex. 8 art. 14 (LCIA Arbitration Rules).  The nature of the Siags' actions and attitude in these proceedings is illustrated by their Memorandum, which states: "In fact, just prior to the March 30 hearing, [the Siags] informed Mr. Gee that *if he did not postpone and stay the proceedings*, they would not appear at the hearing."  Plaintiffs' Memorandum at 16 (emphasis added).  That kind of threat to any adjudicatory body—whether a court or an arbitral tribunal—is not acceptable.  Nonetheless, the LCIA Tribunal proceeded to try to set a prompt jurisdictional briefing schedule, *see* Ex. 7 ¶¶ 16, 19 (Interim Order), which the Siags then wholly ignored, *see* Ex. 38 ¶ 3; Ex. 42 ¶ 3.  The Tribunal also made clear, as it had always done, that any appearance and participation in the

---

[14]    The Siags also seem to make some veiled complaint that the March 30 hearing was held in London when the Contract of Representation calls for the situs of the arbitration to be Houston.  *See* Plaintiffs' Memorandum at 5-6.  If this is a complaint, it is nonsense.  *See* Ex. 8 art. 16.2 (LCIA Arbitration Rules) ("The Arbitral Tribunal may hold hearings, meetings and deliberations at any convenient geographical place in its discretion; and if elsewhere than the seat of the arbitration, the arbitration shall be treated as an arbitration conducted at the seat of the arbitration and any award as an award made at the seat of the arbitration for all purposes.").  Mr. Waguih Siag is a resident of France.  *See* Affidavit of Waguih Siag ¶ 2.  His designated counsel in the LCIA arbitration proceeding resides in London and Paris.

arbitration proceeding by the Siags would be without waiver or prejudice to their jurisdictional objections. *See* Ex. 7 ¶¶ 27(i)-(ii).

In summary, there is simply no evidence of any improper act by the LCIA Tribunal, let alone any evidence satisfying an element necessary to obtain emergency injunctive relief.

### 4. The validity of the arbitration clause in the parties' Contract of Representation

The Siags spend a considerable amount of time rehashing their arguments for why their "counterclaims" should not be compelled to arbitration because of their contention that the agreement to arbitrate is void and unenforceable. *See* Plaintiffs' Memorandum at 17, 21-29, 31, 34-35. King & Spalding will not repeat its arguments as to why these contentions are meritless, but it instead respectfully refers the Court to its prior briefing disarming the Siags' arguments that arbitration should not be compelled. *See* Exs. 13-16.[15] Obviously, these issues and arguments are currently pending before this Court.

## VI. CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiffs' application for a temporary restraining order and preliminary injunction be denied on all grounds.

---

[15] The alleged invalidity and unenforceability of the parties' arbitration agreement also forms the central part of the Siag's opposition to King & Spalding's motion to compel arbitration. *Compare* Plaintiffs' Memorandum at 17, 21-29, 31, 34-35 (the Siags' TRO arguments regarding the alleged invalidity and unenforeability of the parties' arbitration agreement) *with* Ex. 10 at 20-22, 27-32; Ex. 11 at 6-8; Ex. 12 at 10-13 (same arguments used to oppose King & Spalding's motion to compel arbitration). *See generally* Exs. 13-16 (King & Spalding's response to those arguments).

Respectfully submitted,

**GIBBS & BRUNS, L.L.P.**

By: _____

Robin C. Gibbs
Texas State Bar No. 07853000
So. Dist. Bar No. 4790
GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas 77002
Phone: (713) 650-8805
Fax: (713) 750-0903

**ATTORNEY-IN-CHARGE  FOR
DEFENDANTS KING & SPALDING LLP AND
REGINALD R. SMITH**

**Of counsel:**
Scott A. Humphries
Texas State Bar No. 00796800
S.D. Texas Bar No. 20465
Jeffrey C. Kubin
Texas State Bar No. 24002431
S.D. Texas Bar No. 26013
Anthony N. Kaim
Texas State Bar No. 24065532
S.D. Texas Bar No. 1078087
GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of June, 2010, a copy of this pleading was sent to all counsel of record via the District Electronic Case Filing System.

_____
Anthony N. Kaim