## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **WAGUIH SIAG, INDIVIDUALLY, AND** | § | |
| **AS REPRESENTATIVE OF TOURISTIC** | § | |
| **INVESTMENT & HOTELS** | § | |
| **MANAGEMENT COMPANY (SIAG)** | § | |
| **And SIAG-TABA COMPANY** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action No. 4:10-cv-367** |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:10-cv-2096** |
| **KING & SPALDING LLP and** | § | |
| **REGINALD R. SMITH** | § | **(Consolidated Cases)** |
| | § | |
| **Defendants.** | § | |

---

## EXHIBIT 17, PART 1

### TO
### DEFENDANTS' RESPONSE TO
### PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY
### RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

LONDON COURT OF INTERNATIONAL ARBITRATION
Arbitration No. 91491

KING & SPALDING LLP

Claimant

v.

WAGUIH ELIE GEORGE SIAG, MONA SIAG, RAMI SIAG, TOURISTIC
INVESTMENT & HOTELS MANAGEMENT (SIAG) S.A.E., AND SIAG-TABA CO.

Respondents

## CLAIMANT'S SUBMISSION ON JURISDICTION

12 April 2010

GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas 77002
U.S.A.
Telephone: +1 713 650 8805
Fax: +1 713 750 0903
**Counsel for Claimant**

EXHIBIT

17

## TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    TEXAS LAW GOVERNS RESPONDENTS' JURISDICTIONAL OBJECTIONS ......2

III.   RESPONSE TO MISHCON DE REYA'S JURISDICTIONAL OBJECTIONS ON BEHALF OF ALL RESPONDENTS EXCEPT MR. RAMI SIAG ........................3

    A.   The Arbitration Clause in the Contract of Representation Is Valid Because the Evidence Is Conclusive That It Was Not Fraudulently Induced ...................4

    B.   The Mishcon Respondents' Counterclaims Against Claimant Are Arbitrable Even Though They Touch upon Ethical Standards for Texas Attorneys .......................................................................................................9

    C.   There Is No Conflict Between the Mishcon Respondents and Five Members of the LCIA Court As Alleged ...........................................................15

IV.   RESPONSE TO MR. RAMI SIAG'S AND MS. MONA SIAG'S JURISDICTIONAL OBJECTIONS .........................................................................18

    A.   The Siags Benefited from the Settlement with Egypt ........................................18

    B.   The Siags Provided Instructions to King & Spalding Regarding the ICSID Arbitration ........................................................................................................19

    C.   The Siags Are Bound by the Arbitration Clause in the Contract of Representation ...................................................................................................20

V.    ADDITIONAL BRIEFING ............................................................................................25

VI.   CONCLUSION ...............................................................................................................26

## I.   INTRODUCTION

1.      Pursuant to the Tribunal's Interim Order dated 30 March 2010, Claimant King & Spalding LLP files this Submission on Jurisdiction to address Respondents' challenges to this Tribunal's jurisdiction.[1]  *See* Ex. 1 ¶ 19(i) (Interim Order).

2.      Claimant's Submission on Jurisdiction is divided into two parts.  First, Claimant will address the jurisdictional objections made by the Respondents represented by Mishcon de Reya (which firm until recently represented all Respondents except Mr. Rami Siag).[2]  As summarized by the Tribunal in its Interim Order, those objections concern (a) "the circumstances in which the arbitration agreement in the Contract of Representation was obtained," (b) "the arbitrability of certain issues which arise on the merits in this arbitration," and (c) "matters concerning individuals who are members of the Court of the LCIA."  Ex. 1 ¶ 11.

3.      Second, Claimant will address the jurisdictional objections made by (a) Respondent Rami Siag in his email to the Tribunal dated 19 March 2010, *see* Ex. 15, and (b) Respondent Mona Siag in her email to the Tribunal dated 2 April 2010, *see* Ex. 16.  Because the jurisdictional objections of Mr. Rami Siag and Ms. Mona Siag are virtually identical, Claimant will address them jointly.

---

[1]  To the extent Respondents have additional challenges to the Tribunal's jurisdiction or Claimant has in any way misunderstood Respondents' previously made jurisdictional objections, Claimant will address those objections in its reply submission pursuant to Paragraph 19(iii) of the Tribunal's Interim Order; and in that regard, today's submission is in no way a waiver or concession that this Tribunal lacks jurisdiction over any Respondent in any respect regarding the matters encompassed by the arbitration agreement among the parties.

[2]  Mishcon de Reya originally represented all Respondents except Mr. Rami Siag.  *See* Ex. 12 (Letter from Mishcon de Reya to the LCIA dated 11 January 2010 stating that "[w]e are instructed on behalf of Waguih Elie George Siag, Mona Elie George Siag, Touristic Investment & Hotels Management (Siag) S.A.E., and Siag-Taba Co.").  However, Respondent Mona Siag recently stated in her email to the Tribunal dated 2 April 2010 that, although she has previously been represented in this arbitration by Mishcon de Reya, she now intends to "make sure that Mishcon de Reya will not correspond with the LCIA on [her] behalf in the future."  Ex. 16.

4.     In support of its Submission on Jurisdiction, Claimant incorporates herein by reference as if fully set forth herein its Request for Arbitration dated 10 December 2009, its Supplemental Request for Interim Measures and Conservatory Relief dated 18 February 2010, and its Statement of Case dated 8 March 2010, including all witness statements and exhibits attached to each of those three documents.

## II.     TEXAS LAW GOVERNS RESPONDENTS' JURISDICTIONAL OBJECTIONS[3]

5.     The Contract of Representation between Claimant and Respondents states that "all rights and obligations of the parties to this Contract shall be governed by Texas law, without regard to the choice of law rules of Texas." Ex. 2 ¶ 7 (Contract of Representation). Article 16.3 of the LCIA Arbitration Rules permits parties to select the law governing their relationship. Thus, Texas law applies. In Texas, the state's highest court is the Supreme Court of Texas. *See* TEX. GOV'T CODE § 22.001. Below the Supreme Court of Texas and subject to its controlling precedent are Texas's fourteen courts of appeal. *See id.* § 22.201; *Dallas Area Rapid Transit v. Amalgamated Transit Local Union*, 273 S.W.3d 659, 666 (Tex. 2008) ("It is fundamental to the very structure of our appellate system that [the Supreme Court of Texas's] decisions be binding on the lower courts.").

6.     The Contract of Representation also states that the "situs of the arbitration under this Agreement shall be in Houston, Texas, U.S.A." Ex. 2 ¶ 8. As noted by the Tribunal in its Interim Order, "the agreed seat of the Arbitration is Houston, Texas." Ex. 1 ¶ 13. Article 16.2 of the LCIA Arbitration Rules permits parties to select the seat or legal place of their arbitration, and where parties have not made a choice of law as they have here, "[t]he law applicable to the

---

[3] All legal authorities cited herein are contained in a bound volume accompanying this pleading entitled Legal Authorities Cited in Claimant's Submission on Jurisdiction, which includes an alphabetical index of all authorities cited.

arbitration (if any) shall be the arbitration law of the seat of arbitration." LCIA Arbitration Rules art. 16.3. This provision confirms that Texas law applies to the parties' dispute.

## III.   RESPONSE TO MISHCON DE REYA'S JURISDICTIONAL OBJECTIONS ON BEHALF OF ALL RESPONDENTS EXCEPT MR. RAMI SIAG

7.     As noted by the Tribunal in its Interim Order, the jurisdictional objections of the Respondents represented by Mishcon de Reya (the "Mishcon Respondents") essentially concern (a) the circumstances in which the arbitration agreement in the Contract of Representation was obtained, (b) the arbitrability of certain issues that arise on the merits in this arbitration, and (c) matters concerning individuals who are members of the LCIA Court.  *See* Ex. 1 ¶ 11 (Interim Order).  As further noted by the Tribunal in its Interim Order, *see* Ex. 1 ¶ 10, those jurisdictional objections are contained in the Mishcon Respondents' Petition filed in Texas state court in Houston (Harris County), *see* Ex. 3, and in two subsequent federal pleadings filed in U.S. federal court for the Southern District of Texas after the case was removed from state to federal court in Houston, *see* Exs. 5, 7.  The Mishcon Respondents' federal pleadings respond to Claimant's motion to compel arbitration.  *See* Ex. 4 (Claimant's Motion to Compel Arbitration).  All of the "jurisdictional" pleadings filed in U.S. federal court in Houston (Claimant's motion to compel arbitration, Mishcon Respondents' response, Claimant's reply, and Mishcon Respondents' surreply) are attached hereto in chronological order as Exhibits 4 through 7.  In addition, since the Tribunal issued its Interim Order on 30 March 2010, Mr. Patrice d'Herbomez (counsel for Respondent Waguih Siag) has written twice to the LCIA reiterating Mr. Siag's concerns regarding certain individuals who are members of the LCIA Court.  *See* Ex. 17 (Patrice d'Herbomez's letter to the LCIA dated 6 April 2010); Ex. 23 (Patrice d'Herbomez's letter to the LCIA dated 9 April 2010).

A.     **The Arbitration Clause in the Contract of Representation Is Valid Because the Evidence Is Conclusive That It Was Not Fraudulently Induced**

8.     The Mishcon Respondents originally argued in their Texas lawsuit that the arbitration clause in the Contract of Representation was procured by fraud because (allegedly) one of Claimant's partners was a member of the LCIA Court at the time of contracting and this fact was not disclosed to Respondents. *See* Ex. 3 at pp. 8-9 (Mishcon Respondents' Texas Petition). That allegation was subsequently proved by Claimant to be false, and so the Mishcon Respondents now argue that the fact that Mr. James Castello became a member of the LCIA Court in 2007 and subsequently joined King & Spalding in 2009 somehow invalidates the arbitration agreement entered into among the parties years before *in 2004*. *See* Ex. 5 at Part II(B)(1) (found at pp. 23-25) (Mishcon Respondents' Memorandum of Law). For the reasons set forth below, these allegations in no way invalidate the arbitration agreement among the parties.

9.     The Contract of Representation between Claimant and the Mishcon Respondents contains a written, conspicuous, and signed arbitration agreement. *See* Ex. 2 ¶ 8 (Contract of Representation). The Mishcon Respondents freely entered into the Contract of Representation containing the arbitration agreement, with each of Mr. Waguih Siag, Ms. Mona Siag, Touristic Investment & Hotels Management (SIAG) S.A.E., and Siag-Taba Co. signing the contract. *See id.* at pp. 8-9. The contracting parties then proceeded to operate under the Contract of Representation for over five years as King & Spalding successfully represented the Mishcon Respondents in their ICSID arbitration against Egypt prior to Respondents' secret settlement with Egypt. *See* Ex. 3 at pp. 3-4 (Mishcon Respondents' Texas Petition) ("Plaintiffs retained the services of King & Spalding under the terms described above. At the conclusion of [the] arbitration, Plaintiffs were awarded approximately $133 million."). On such evidence in Texas, "[t]he law presumes contracts to be valid" with the burden falling on the party seeking to avoid

the contract to prove the grounds on which it is invalid.  *Clark v. Power Mktg. Direct, Inc.*, 192 S.W.3d 796, 800 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  In particular, the Mishcon Respondents' claim that the arbitration clause within the Contract of Representation was fraudulently induced is meritless and should be summarily dismissed.[4]

10.    The Mishcon Respondents' Texas Petition alleges that they were "fraudulently induced to agree to this arbitration clause because King & Spalding fraudulently failed to disclose that one of its own partners is, ***and was at the time of the arbitration agreement's execution***, a member of the LCIA's board of directors."  Ex. 3 at p. 9 (emphasis added).  That allegation is patently false.  No partner or attorney at King & Spalding was (or was anticipated to be) a member of the LCIA's Board of Directors in 2004 when the Contract of Representation was executed.  *See* Witness Statement of Reginald R. Smith ("Smith WS") ¶ 4.  In fact, no partner or attorney at King & Spalding has ever been a member of the LCIA's Board of Directors.  *See id.*

---

[4] Although the Mishcon Respondents largely target their fraudulent inducement allegations narrowly at the arbitration clause within the Contract of Representation and not at the Contract of Representation as a whole, they do make certain broader attacks on other provisions within the Contract of Representation. *See* Ex. 5 at Part II(B)(3) (found at pp. 27-32) (Mishcon Respondents' Memorandum of Law).  These (unfounded) attacks do not and cannot vitiate the arbitration clause within the Contract of Representation because such broader challenges to the validity of other clauses within the Contract of Representation do not invalidate an otherwise valid agreement to arbitrate.  As long as the arbitration clause itself is valid, which it is, then any question as to the validity of the contract as a whole or a certain clause therein cannot be used to challenge arbitral jurisdiction.  *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446-47 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."); *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002) ("When conducting this two-pronged analysis [to compel arbitration], courts must not consider the merits of the underlying action."); *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 648 (Tex. 2009) ("[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.").  The Mishcon Respondents cannot avoid arbitration by arguing the merits of their claims.  Rather, they must point to specific evidence that proves the arbitration clause itself was fraudulently induced in order to avoid arbitration, and this they wholly fail to do. Nonetheless, although irrelevant to its jurisdictional analysis, to the extent the Tribunal is interested in Claimant's response to the Mishcon Respondents' broader attacks on the Contract of Representation, they are addressed in Claimants' Statement of Case.  *See* Claimant's Statement of Case at Part III(B)(1)-(3) (found at pp. 75-89) (on file) (incorporated herein by reference as if set forth fully herein).

11.     Today, a current partner at King & Spalding is a member of the LCIA Court (not its Board of Directors), but Mr. James Castello did not join King & Spalding until March 2009, having joined the LCIA Court in 2007—all years after the execution of the Contract of Representation in 2004. *See id.* ¶ 5; *see also* Ex. 13 (LCIA letter dated 14 January 2010 stating that "James Castello . . . is not, and has never been, a member of the LCIA's Board of Directors."); Ex. 14 (LCIA letter dated 26 January 2010 including an LCIA Court membership list showing that Mr. Castello was appointed to the LCIA Court in May 2007).  Importantly, in 2004, when the Contract of Representation was executed, no partner or attorney at King & Spalding was (or was anticipated to be) a member of the LCIA Court. *See* Smith WS ¶ 5.  The fact that an individual became a member of the LCIA Court three years after the Contract of Representation was executed at a time when he was not working at King & Spalding and then joined King & Spalding another two years later (or five years after the Contract of Representation was executed) does not establish fraudulent inducement to arbitrate.

12.     In Texas, "to establish fraud in the formation of an arbitration agreement, a party must prove that (1) a material misrepresentation was made, (2) it was false, (3) when the speaker made the representation he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion, (4) the speaker made it with the intention that it should be acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered injury." *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 372 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding) ("Given that Swinton is presumed to know the contents of a document he signed, and in view of the conspicuous notice of the agreement to arbitrate provided in the benefit agreement, we hold that the trial court could only have reached one conclusion: that Swinton knowingly agreed to arbitrate.").  The Mishcon Respondents' allegation specifically

claims fraud by nondisclosure, which has similar elements and occurs when "[a] a party conceals or fails to disclose a material fact within the knowledge of that party, [b] the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, [c] the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and [d] the other party suffers injury as a result of acting without knowledge of the undisclosed fact." *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).

13.     Under either fraudulent inducement theory, the Mishcon Respondents' claim fails at the first element.  During the negotiation and formation of the Contract of Representation, there was no material fact withheld and no material misrepresentation made to the Mishcon Respondents.  This is established by the fact that in 2004, when the parties signed the arbitration agreement, no partner or attorney at King & Spalding was (or was anticipated to be) a board or Court member of the LCIA.  *See* Smith WS ¶¶ 4-5.  It is simply impossible for the Mishcon Respondents to have been induced to enter into the arbitration agreement based on the alleged misrepresentation or withholding of a nonexistent fact.  The truth is that no King & Spalding attorney has ever been a member of the LCIA's Board of Directors, and no King & Spalding attorney was a member of the LCIA Court until March 2009—nearly five years after the Mishcon Respondents entered into the Contract of Representation—when Mr. James Castello joined the firm from Dewey & LeBoeuf where he had been an LCIA Court member since March 2007.  *See id.* ¶ 5; *see also* Ex. 19 (King & Spalding's Castello press release).  The Mishcon Respondents could not have been induced to agree to arbitrate by a misrepresentation about a wholly unanticipated situation that only developed years after the arbitration agreement was entered.  In other words, logically, alleged nondisclosures withheld with the intention of inducing a party to enter a contract must precede the signing of the contract.  *See Formosa Plastics Corp.*

*USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (finding evidence supporting fraudulent inducement to enter a contract where the facility owner misrepresented to the bidding contractor that the contractor could control the delivery of concrete, when in fact, the owner "decided, two weeks *before* the contract was signed, to take over the delivery of the concrete" (emphasis added)).   That no King & Spalding attorney had any affiliation with the LCIA until five years after the Mishcon Respondents contracted to arbitrate "any dispute, controversy, or claim" with Claimant precludes any claim that the Mishcon Respondents were fraudulently induced to agree to arbitrate.   Therefore, the Mishcon Respondents' fraud-in-the-inducement-of-the-arbitration-clause claim—a claim on which they bear the burden of proof—fails as a matter of law, and this Tribunal has jurisdiction to hear this dispute.

14.      Even assuming, *arguendo*, that the first element of the Mishcon Respondents' claim that they were fraudulently induced to agree to arbitrate is met—which it is not—the claim wholly lacks merit as to other elements.   Fraud requires that the nondisclosure be material and that there be a resulting injury.   *See Bradford*, 48 S.W.3d at 754-55.   The systematic procedures instituted by the LCIA to guarantee the independence and impartiality of the arbitrators it appoints fully protect parties even in the situation in which an adversary has a member on the LCIA Court.   The Constitution of the LCIA Court provides that "[n]o member of the Court who has a connection with an arbitration in relation to which the LCIA exercises any function of any kind may participate in or influence any decision of the Court relating to such arbitration."   Ex. 20 at D.5 (LCIA Constitution); *see also* LCIA Arbitration Rules art. 5.3 (stating that an arbitrator "shall sign a declaration to the effect that there are no circumstances known to him likely to give rise to any justified doubts as to his impartiality or independence" and imposing on arbitrators a "continuing duty forthwith to disclose any such circumstances" that are "likely to give rise to any

justified doubts as to his impartiality or independence"). The LCIA has twice confirmed these procedures regarding Mr. Castello and stated that Mr. Castello neither has nor will participate in any way in this arbitration proceeding. *See* Ex. 13 (LCIA letter dated 14 January 2010 stating that "Mr. Castello is a member of the Arbitration Court of the LCIA and, as such, would naturally be excluded from any connection with the present dispute"); Ex. 18 (LCIA email dated 7 April 2010 stating that Mr. Castello has not "been involved [in this arbitration proceeding] at any level, and none of them will be involved going forward"). Accordingly, even if a King & Spalding attorney had been a member of the LCIA Court when the Mishcon Respondents agreed to arbitrate—which, again, is not the case—that could not have been material to the Mishcon Respondents' decision regarding whether to agree to arbitrate and could not have resulted in injury in light of the LCIA's impartiality and conflict-of-interest rules and procedures. In any event, the Mishcon Respondents cannot meet their burden to prove such.

15.     Accordingly, because the arbitration clause in the Contract of Representation was freely entered into by all parties in 2004, it is valid, binding, and confers jurisdiction on this Tribunal.

**B.     The Mishcon Respondents' Counterclaims Against Claimant Are Arbitrable Even Though They Touch upon Ethical Standards for Texas Attorneys**

16.     The Mishcon Respondents argue that the claims they bring in their Texas lawsuit against Claimant and Mr. Reginald Smith, the lead partner who handled the Siags' ICSID arbitration on behalf of Claimant (and whom the Tribunal met at the hearing in London on 30 March 2010), are not arbitrable because "[c]auses of action brought by a former client against his attorney concerning violation of the Disciplinary Rules and Codes of Professional Responsibility are not arbitrable." Ex. 5 at p. 20 (Mishcon Respondents' Memorandum of Law). The Mishcon

Respondents make this argument in Part II(A) of their Memorandum of Law, *see id.* at pp. 20-22, and in Part I(B) of their Reply Memorandum of Law, *see* Ex. 7 at pp. 6-8.

17.     Two important preliminary points must be made regarding this argument.  First, the Mishcon Respondents do not contend (nor could they contend) that this Tribunal lacks jurisdiction to hear *Claimant's claims against Respondents* that are brought in this LCIA arbitration.  Rather, the only issue before the U.S. federal court in Houston as well as this Tribunal is whether this Tribunal has jurisdiction to hear *the Mishcon Respondents' counterclaims against Claimant and Mr. Smith*, which the Mishcon Respondents are currently attempting to litigate in Texas instead of as part of this arbitration.  It is those counterclaims alone that the Mishcon Respondents allege are nonarbitrable because they touch upon ethical standards.  *See* Ex. 5 at Part II(A) (found at pp. 20-22); Ex. 7 at Part I(B) (found at pp. 6-8). While the Mishcon Respondents have not yet brought those counterclaims in this arbitration, they must do so in their Statement of Defense due on 21 April 2010 or risk waiving them.  *See* LCIA Arbitration Rules art. 15.3 ("Any counterclaims shall be submitted with the Statement of Defense . . . .").

18.     Second, in their Texas lawsuit, the Mishcon Respondents bring standard, everyday Texas common-law causes of action against Claimant and Mr. Smith; namely, a claim for a declaratory judgment, negligence, common-law fraud, fraudulent inducement, and breach of fiduciary duty.  *See* Ex. 3 at Parts 6-9 (found at pp. 5-10) (Mishcon Respondents' Texas Petition).  Regarding the relationship between such common law causes of action and the Texas Disciplinary Rules of Professional Conduct, the Rules are crystal clear: "These rules *do not* undertake to define standards of civil liability for lawyers for professional conduct.  Violation of a rule *does not give rise to* a private cause of action nor does it create any presumption that a

legal duty to a client has been breached." Ex. 21 at "Preamble: Scope" cmt. 15 (emphasis added). A plaintiff's common-law cause of action might, at times, be informed by the Texas Disciplinary Rules of Professional Conduct, but a private plaintiff cannot sue *on* those Rules—as even the Mishcon Respondents admit regarding their Texas lawsuit when they state in their Petition that they are not suing *on* the Texas Disciplinary Rules of Professional Conduct themselves, but rather they are suing *on* common law causes of action that merely "implicate" those rules.[5] In summary, the Texas Disciplinary Rules of Professional Conduct are wholly distinct and separate from common-law causes of action—such as those in the Mishcon Respondents' Texas lawsuit—that are brought everyday in Texas courts against attorneys and regularly referred to arbitration.

19.     Turning to the substance of the Mishcon Respondents' argument, their assertion that, because the alleged facts underlying their common-law causes of action touch upon disciplinary and/or ethical rules, those claims are not arbitrable is untenable under Texas law. For support, the Mishcon Respondents cite three factually distinguishable cases from New York, a jurisdiction whose law is irrelevant in Texas. They cite no Texas law—which governs this dispute—because Texas law is clear that legal malpractice and other common-law claims between an attorney and client are arbitrable.

20.     The Professional Ethics Committee for the State Bar of Texas made this very point in Opinion No. 586, in which it considered whether provisions in lawyer-client engagement agreements requiring binding arbitration of fee disputes and malpractice claims are permissible.

---

[5]    *See* Ex. 5 at p. 20 (Mishcon Respondents' Memorandum of Law) (stating that the Mishcon Respondents' Texas common-law causes of action "expressly *implicate* Texas ethical Rules and cannons of professional behavior for attorneys" as opposed to actually bringing claims for the violation of such rules and cannons (emphasis added)); *id.* at p. 21 (stating that "Plaintiffs' Texas common law claims . . . squarely *implicate* attorney Disciplinary Rules and Codes of Professional Responsibility" as opposed to actually bringing claims for violation of such rules and codes (emphasis added)).

*See* Ex. 22 (Ethics Opinion No. 586).  The Committee concluded: "It is permissible under the Texas Disciplinary Rules of Professional Conduct to include in an engagement agreement with a client a provision . . . requiring the binding arbitration of fee disputes *and* malpractice claims." *Id.* (emphasis added).

21.     Multiple Texas cases have cited and followed this Ethics Committee Opinion and compelled legal malpractice claims to arbitration.  In one of those cases, *Abdel Hakim Labidi v. Sydow*, the facts are strikingly similar to those here.  *See* 287 S.W.3d 922 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding).  In that case, Mr. Labidi, the plaintiff in the underlying suit, settled his case directly with the defendant and then refused to pay his attorney's legal fees.  *See id.* at 925.  The attorney initiated arbitration to collect his fee.  *See id.*  Labidi responded by filing suit in a Texas state court against his attorney, alleging counterclaims of "breach of fiduciary duty, breach of contract, fraud, legal malpractice, and negligence; he also sought a declaration that he owed no fees under the engagement letter."  *Id.*  Notably, these are essentially the exact same claims lodged by the Mishcon Respondents in their Texas lawsuit against Claimant and Mr. Smith.  *See* Ex. 3 at pp. 5-10 (Mishcon Respondents' Texas Petition).  The appellate court in *Labidi* upheld the trial court's order compelling arbitration of all of the client's claims: "Contrary to Labidi's suggestion, even disputes between a lawyer and client that involve their contract, the attorney-client relationship, or services rendered or fees charged to the client are properly referable to arbitration."  *Labidi*, 287 S.W.3d at 928.

22.     Even more recently, the Houston Court of Appeals granted an extraordinary writ (called a writ of mandamus in Texas) reversing a Texas trial court and concluding that the trial court clearly abused its discretion in not compelling arbitration of a client's legal malpractice claims.  *See Pham v. Letney*, 2010 WL 727550 (Tex. App.—Houston [14th Dist.] 2010, orig.

proceeding).   The client argued that the Texas Disciplinary Rules of Professional Conduct prevented arbitration of legal malpractice claims because a lawyer cannot "make an agreement prospectively limiting the lawyer's liability to a client for malpractice." *Id.* at *7 (citing Rule 1.08(g)).   The appellate court rejected the argument that the Disciplinary Rules proscribe arbitration of legal malpractice claims because "an agreement to arbitrate, does not, in fact, limit a party's liability; it merely denominates a procedure for determining that liability." *Id.* In other words, arbitration is a valid and recognized procedure for determining legal malpractice liability under Texas law.   Accordingly, the *Pham* court compelled the client to arbitrate its legal malpractice claims against his attorney. *Id.*[6] Based upon these cases, the Mishcon Respondents' argument that Texas law limits the arbitrability of disputes between a lawyer and client—even legal malpractice disputes involving ethical issues—wholly lacks merit.

23.     Without any support in Texas law, which controls this proceeding, the Mishcon Respondents resort to three New York cases. *See* Ex. 5 at pp. 20-21 (Mishcon Respondents' Memorandum of Law) (citing *In re R3 Aerospace, Inc.*, 927 F. Supp. 121 (S.D.N.Y. 1996); *Bidermann Indus. Licensing, Inc. v. Avmar*, 570 N.Y.S.2d 33 (N.Y. App. Div. 1991); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1452 (E.D.N.Y. 1985)).   These cases are both legally and factually inapposite to this dispute. First, New York law is legally irrelevant because Texas law, which plainly rejects the Mishcon Respondents' assertion, controls this dispute.   Under Texas law, "[w]here Texas cases provide clear authority on the issue, case law from other states

---

[6]  Myriad other Texas cases have compelled arbitration of similar legal malpractice claims involving ethical issues. *See, e.g., Chambers v. O'Quinn, P.C.*, 2009 WL 3152968, at *5 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("Whether to impose conditions upon the enforceability of arbitration provisions between attorney and client is a matter for the legislature, not the courts. . . . The legislature's failure to impose such conditions on attorney-client contracts, while expressly recognizing them in other contexts, indicates that the legislature did not intend to impose such conditions."); *Taylor v. Wilson*, 180 S.W.3d 627, 628 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (reversing the trial court's order denying attorneys' motion to compel arbitration of client's claim for legal malpractice).

is irrelevant." *Travelers Indem. Co. v. Page & Assocs. Constr. Co.*, 1998 WL 720957, at *7 (Tex. App.—Amarillo 1998, pet. denied) (citing *Gross v. Innes*, 930 S.W.2d 237, 240 (Tex. App.—Dallas 1996, writ dism'd)); *see also Thompson v. City of Carrollton*, 211 S.W.2d 970, 972 (Tex. App.—Texarkana 1948, no writ) ("We would not be justified in following the holding in that [non-Texas] case in view of a contrary holding by the courts of this state."). In the face of controlling Texas law, New York case law is irrelevant.

24.     But even if New York case law could be considered in this dispute—which it cannot—the cited cases are unavailing on their facts. Both *R3 Aerospace* and *Bidermann* involved attorney disqualification proceedings—as distinct from legal malpractice common-law causes of action—which New York courts have found to be too intertwined with public policy to be removed from the hands of the courts. *See Bidermann*, 570 N.Y.S.2d at 402; *In re R3 Aerospace*, 927 F. Supp. at 125. Similarly, *In re Agent Orange* involved a dispute over attorneys' fees in a class action settlement; a subject matter which the court has a statutorily mandated duty to oversee pursuant to Federal Rule of Civil Procedure 23(e). *See* 611 F. Supp. at 1458. These three New York cases involved particular responsibilities that the New York courts found they could not abdicate. In contrast, New York courts have expressed no hesitance to compel legal malpractice and other common-law causes of action between an attorney and client to arbitration. *See, e.g., Edelman v. Marek*, 1992 WL 321715, at *7-8 (S.D.N.Y. 1992) (compelling arbitration of a former client's claims of malpractice and breach of fiduciary duty against her former attorney); *Monahan v. Paine Webber Group, Inc.*, 724 F. Supp. 224, 227 (S.D.N.Y. 1989) (compelling arbitration of a client's legal malpractice claim against his attorney over the plaintiff's objection that arbitrators are not competent to determine claims of legal malpractice). The precise reason for this distinction in New York is unimportant, especially in

light of the nonapplicability of New York law to this dispute; the upshot being that even if New York law were apposite—which it is not—it too supports this Tribunal's jurisdiction to arbitrate the Mishcon Respondents' common-law causes of action lodged against Claimant.

25.    In sum, under Texas law, legal malpractice and other common-law claims between an attorney and client, even though they may touch upon ethical standards, are regularly compelled to arbitration by Texas courts.  This Tribunal, therefore, has jurisdiction over the Mishcon Respondents' counterclaims against Claimant and Mr. Smith.

**C.    There Is No Conflict Between the Mishcon Respondents and Five Members of the LCIA Court As Alleged**

26.    The Mishcon Respondents argue that a conflict of interest exists between them and five members of the LCIA Court.  *See* Ex. 5 at Part II(B)(2) (found at pp. 25-26) (Mishcon Respondents' Memorandum of Law).    Specifically, the Mishcon Respondents allege that conflicts exist because:

a.    Mr. Jan Paulsson, current President of the LCIA Court,

REDACTED

b.    Mr. Karin Hafez, a current LCIA Court member, appeared in the underlying ICSID arbitration on behalf of Egypt. *See id.* at p. 26.

c.    Mr. Karl-Heinz Böckstiegel, a current honorary Vice President of the LCIA Court, was appointed President of the Tribunal in the underlying ICSID arbitration but then resigned for personal reasons. *See id.*

d.    Ms. Gabrielle Kaufman-Kohler, a current member of the LCIA Court, declined to serve as President of the Tribunal in the underlying ICSID arbitration. *See id.*

e.    Mr. Hamid Gharavi, a current member of the LCIA Court, is a personal relation of Respondent Waguih Siag. *See id.*

---

[7]  For further information on this allegation, see Claimant's Statement of Case at paragraph 74.

For the reasons set forth below, none of these allegations presents a conflict that deprives this Tribunal of jurisdiction over the Mishcon Respondents.

27.     First, this arbitration is being conducted by this Tribunal (Mr. Gee), not any of the listed members of the LCIA Court. This Tribunal signed a Statement of Independence as part of accepting its appointment, *see* Ex. 10, and there is no credible allegation of any conflict of interest between this Tribunal and the Mishcon Respondents.

28.     Second, as previously noted, the Constitution of the LCIA Court provides that "[n]o member of the Court who has a connection with an arbitration in relation to which the LCIA exercises any function of any kind may participate in or influence any decision of the Court relating to such arbitration." Ex. 20 at D.5 (LCIA Constitution). Thus, the LCIA's own governing documents account for and prevent any danger of the type of conflict alleged by the Mishcon Respondents having any effect on this arbitration proceeding.

29.     Third, the LCIA itself has confirmed in writing twice that none of the five LCIA Court members listed above have participated in any way in this arbitration proceeding to date or will participate in any way in this arbitration proceeding in the future. *See* Ex. 18 (Email from Mr. Rémy Gerbay, Deputy Registrar of the LCIA, dated 7 April 2010); Ex. 24 (Email from Mr. Rémy Gerbay, Deputy Registrar of the LCIA, dated 12 April 2010). The LCIA further confirmed in writing twice that the only member of the LCIA Court to be involved in this arbitration to date is Mr. Paul B. Hannon, Vice President of the LCIA Court, and his involvement has been limited to the appointment of this Tribunal. *See id.* Indeed, it was Mr. Hannon who signed the Tribunal's letter of appointment. *See* Ex. 11 (Letter of Appointment dated 4 February 2010).

30.     Accordingly, setting aside whether the Mishcon Respondents' allegations of a conflict of interest are substantively valid (which Claimant disputes), that issue is irrelevant because the five LCIA Court members about whom the Mishcon Respondents complain have not been and will not be involved in this proceeding in any fashion as confirmed in writing by the LCIA. *See* Exs. 18, 24.

31.     Finally, Claimant must briefly address one point made in Mr. Patrice d'Herbomez's letter to the LCIA dated 6 April 2010. *See* Ex. 17. In that letter, Mr. d'Herbomez makes a number of unfounded allegations against this Tribunal itself, *see id.* at pp. 4-5, but in particular, Mr. d'Herbomez argues that the Tribunal's Interim Order dated 30 March 2010 "does not take into account any of [the] arguments nor the counterclaims of Mr. Siag in the proceedings in Texas while he does for all the positions of King & Spalding," *see id.* at 4. This statement is patently false. First, counsel for Claimant attended the 30 March 2010 hearing that resulted in the Tribunal's Interim Order, and at that hearing (which lasted for over eight hours), Claimant's counsel was extensively questioned about arguments and allegations made by Mr. Siag in both his Texas lawsuit and his counsel's correspondence with the LCIA. Second, the Tribunal's Interim Order itself makes crystal clear that "the Tribunal has reviewed all of the submissions made by . . . Respondents (including evidence and exhibits attached to those submissions) since the beginning of this arbitral proceeding, including . . . Respondents' filings in the U.S. District Court for the Southern District of Texas including all exhibits thereto, Mr. Waguih Siag's Declaration dated 6 March 2010 including Paragraph 29 thereof, and Mishcon de Reya's communications with the LCIA and the Tribunal . . . ." Ex. 1 ¶ 20 (Interim Order); *see also id.* ¶ 10 (listing specific pleadings filed by Mr. Siag that the Tribunal reviewed).

## IV.   RESPONSE TO MR. RAMI SIAG'S AND MS. MONA SIAG'S JURISDICTIONAL OBJECTIONS

32.     The jurisdictional objections of Mr. Rami Siag and Ms. Mona Siag (collectively, the "Siags") are virtually identical. They contend that jurisdiction is improper because: (a) they allegedly did not benefit (directly or indirectly) from the Siags' secret settlement with Egypt; (b) they did not provide Claimant with any instructions regarding the ICSID arbitration; and (c) Mr. Rami Siag's signature is not on the Contract of Representation itself. *See* Ex. 15 (Mr. Rami Siag's jurisdictional objections); Ex. 16 (Ms. Mona Siag's jurisdictional objections). For the following reasons, these objections are meritless.

### A.   The Siags Benefited from the Settlement with Egypt

33.     Regarding the Siags' contention that they did not benefit (directly or indirectly) from the settlement with Egypt, their own written submissions to the Tribunal prove that this is not true. *See* Exs. 15-16. Both Mr. Rami Siag and Ms. Mona Siag admit that they are beneficiaries of their mother's estate, that they succeeded (in part) to her ICSID claim, and that they will receive sums from her estate in the future under Egyptian probate laws and procedure. *See id.* Their mother, Ms. Clorinda Vecchi, was a signatory to the Contract of Representation, and presumably her estate will receive funds from Respondents' settlement with Egypt that will in the future be distributed to the Siags. The Siags admits as much when they coyly allege that they have not benefited from the settlement to date, but then add regarding the future: "I do not expect to receive any benefit from the settlements *in the foreseeable future.*" *Id.* (emphasis added). That is to say, they are to receive a benefit from the settlements in the future, just not the "foreseeable" future. This wholly undermines the Siags' contention that they did not and will not benefit from the settlement with Egypt.

34.    Furthermore, Mr. Rami Siag admits that he is a shareholder in Respondent Siag-Taba Co., and Ms. Mona Siag admits that she is a shareholder in both Respondents Siag-Taba Co. and Touristic Investment & Hotels Management (SIAG) S.A.E.  *See* Exs. 15-16.  Those two entities were the Siag-controlled entities that owned the Taba property which was expropriated by Egypt and which was the subject of the ICSID arbitration and award.  *See* Claimant's Statement of Case ¶ 15.  They are also signatories to the Contract of Representation.  *See* Ex. 2 at pp. 8-9 (Contract of Representation).  Thus, to the extent Respondents' settlement with Egypt benefited the two entities that actually owned the property at issue, the Siags benefited as shareholders in those companies.  For the Siags to credibly argue that they did not benefit from the settlement through Siag-Taba Co. or Touristic Investment & Hotels Management (SIAG) S.A.E, they must first, at the very least and as an evidentiary matter, provide Claimant with a copy of the settlement agreement(s) and all other disclosures required in the Tribunal's Interim Order dated 30 March 2010.[8]

**B.      The Siags Provided Instructions to King & Spalding Regarding the ICSID Arbitration**

35.    The Siags both state that they "did not provide King & Spalding LLP with any instructions" regarding the ICSID arbitration against Egypt. Exs. 15-16.  This is simply not true.  After their mother passed away, both Mr. Rami Siag and Ms. Mona Siag succeeded (in part) to Ms. Vecchi's ICSID claim, and they both signed Powers of Attorney acknowledging this fact and instructing King & Spalding to represent them in the ICSID arbitration as necessary pursuant to the Contract of Representation.  *See* Claimant's Statement of Case ¶ 1 n.1.  Specifically, those

---

[8]  Although its relevance is not clear, the Siags allege that Claimant did not represent Respondents Siag-Taba Co. and Touristic Investment & Hotels Management (SIAG) S.A.E. in the ICSID arbitration.  *See* Exs. 15-16.  While it is true that those two entities were not claimants in the ICSID arbitration, King & Spalding did represent them as part of the arbitration process, and they were signatories to the Contract of Representation.  *See* Ex. 2 at pp. 1, 8-9 (Contract of Representation).

Powers of Attorney state that both Mr. Rami Siag and Ms. Mona Siag "authorize and grant this Power of Attorney to [King & Spalding LLP] and its attorneys . . . (collectively, the 'Authorized Individuals' and, individually, each an 'Authorized Individual') . . . to do the following:"

    (a)    "To prosecute to completion the ICSID Claim."

    (b)    "On our behalf, from time to time, to take such actions and execute and deliver such certificates, instruments, notices, consents and documents, or to effect filings with ICSID, judicial, regulatory or other governmental authorities as may be required . . . ."

    (c)    "To execute any document authorized by the foregoing actions or any document executed in the accomplishment of any action or actions so authorized . . . ."

    (d)    "To perform such further acts and deeds as may be necessary, appropriate or advisable, in the judgment of any such Authorized Individual, to carry out the purposes and intents of the foregoing actions."

    (e)    "In addition, we hereby ratify any such actions by K&S consistent with the above which may have been taken between the date of Clorinda Vecchi's death and the respective effective dates below."

Ex. 8 (Mr. Rami Siag's Power of Attorney dated 4 April 2008); Ex. 9 (Ms. Mona Siag's Power of Attorney dated 5 April 2008). As a consequence, it is simply not true for the Siags to state that they never gave instructions to Claimant in the ICSID arbitration. To the contrary, they gave Claimant complete and full Powers of Attorney to act on their behalf in pursuing the ICSID claim to which they succeeded on their mother's death. *See* Exs. 8-9 ("Rami Elie George Siag . . . and Mona Elie George Siag all accepted their succession to Clorinda Vecchi's estate . . . and thus succeeded to Ms. Vecchi's estate and her ICSID Claim in equal shares . . . .").

## C.    The Siags Are Bound by the Arbitration Clause in the Contract of Representation

36.    Ms. Mona Siag is bound by the Contract of Representation because she signed it in 2004 when it was originally executed by all parties, *see* Ex. 2 at p. 8, and she admits freely and

knowingly doing so, *see* Ex. 16 ("In 2004 I signed the Contract of Representation with King &

Spalding LLP.").

37.    Mr. Rami Siag is bound by the Contract of Representation because, although he

did not sign it in 2004, he freely, knowingly, and in writing succeeded to its terms when his

mother passed away in 2007. To start with, the Contract of Representation—as executed by Mr.

Siag's mother—provides that "[t]his Contract shall inure to the benefit of and bind successors

and assigns of the parties hereto." Ex. 2 ¶ 14 (Contract of Representation). After the death of

Mr. Siag's mother in 2007, Mr. Siag signed a sworn Power of Attorney in favor of Claimant in

which he admits:

> (a)    "Clorinda Vecchi at the time of her death was a claimant in an arbitration
> before the International Centre for Settlement of Investment Disputes
> ('ICSID') styled *Waguih Elie George Siag and Clorinda Vecchi v. The
> Arab Republic of Egypt*, bearing ICSID Case No. ARB/05/15 (the 'ICSID
> Claim')."

> (b)    "Rami Elie George Siag . . . *accepted* [his] succession to Clorinda
> Vecchi's estate in a Power of Attorney executed . . . on February 26 or 27,
> 2008, *and thus succeeded* to Ms. Vecchi's estate *and her ICSID Claim* in
> equal shares" with other members of his family.

Ex. 8 (Mr. Siag's Power of Attorney dated 4 April 2008) (emphasis added). Mr. Siag then

proceeds, in the same sworn Power of Attorney, to acknowledge and agree that because he is a

successor to his mother's ICSID claim, he is also bound by the Contract of Representation:

> NOW, THEREFORE, WE, THE UNDERSIGNED, . . . *each of us being
> successors in proportionate part to Clorinda Vecchi's ICSID Claim*, and each of
> us further being aware that Clorinda Vecchi's contract of representation with the
> law firm of King & Spalding LLP (K&S) in connection with the ICSID Claim
> provides that *the contract is binding on Clorinda Vecchi's successors*, do
> hereby, and to the extent necessary, authorize and grant this Power of Attorney to
> K&S and its attorneys . . . [t]o prosecute to completion the ICSID Claim [and to
> take such other actions] [o]n our behalf . . . as may be required . . . [including] [t]o
> perform such further acts and deeds as may be necessary, appropriate or advisable
> . . . to carry out the purposes and intents of the foregoing actions.

*Id.* Thus, the Contract of Representation binds Mr. Siag by its own terms, and in any event, Mr. Siag acknowledges and agrees in his sworn Power of Attorney that the Contract of Representation is binding on him as a successor to his mother's ICSID claim. *See id.* In summary, Mr. Rami Siag is effectively a signatory to the Contract of Representation.

38.     This point is made all the more clear by Mr. Siag's instruction to Claimant in his sworn Power of Attorney that Claimant is to continue to represent him in all respects in the ICSID arbitration. *See id.* Based upon the benefits he thereby received from Claimant, it simply cannot be the case that Mr. Siag may now claim that he is not bound by the Contract of Representation when:

(a)     He instructed and authorized Claimant to act on his behalf in the ICSID arbitration by signing a sworn Power of Attorney on 4 April 2008. *See id.*

(b)     He then proceeded to utilize, benefit from, and allow Claimant to represent his interests in the ICSID arbitration *without protest or objection* and *without making any payment to Claimant for its services* for over two years between 16 October 2007 and 17 November 2009, the day Claimant learned of Respondents' secret settlement with Egypt. *See* Smith WS ¶ 7.

(c)     He admits in his email to this Tribunal dated 19 March 2010 that he will indeed receive funds from his mother's estate under Egyptian probate laws and procedure. *See* Ex. 15 ("Whilst I am a beneficiary of my mother's estate, I have not *yet* received any sums from the estate" (emphasis added)). And when he does receive such funds, they will include monies from Respondents' settlement with Egypt. *See id.* ("Moreover, I do not expect to receive any benefit from the settlements *in the foreseeable future.*" (emphasis added)).

Mr. Siag's position is unfair, unjust, and ignores equity. Mr. Siag freely and knowingly agreed to accept and benefit from Claimant's services in representing his interests for over two years (in addition to the work Claimant performed for his mother) in the ICSID arbitration against Egypt without the requirement of any payment, yet he now wants to take the benefits he received under

the Contract of Representation without honoring the contract's arbitration clause, contingent fee provision, and other payment terms. Texas law does not sanction such conduct.

39.    "The rule in Texas is, that a contract in writing signed by one party and expressly accepted orally by the other, or the terms thereof performed and the benefits thereof accepted, is in law the written contract of the parties and binding on both." *Rubin v. Polunsky*, 366 S.W.2d 234, 236 (Tex. App.—San Antonio 1963, writ ref'd n.r.e.); *see also Velasquez v. Schuehle*, 562 S.W.2d 1, 3 (Tex. App.—San Antonio 1977, no writ) ("To constitute a valid contract in writing it is not necessary that the agreement be signed by both parties, for if one party signs, the other may accept by his acts, conduct, or acquiescence in the terms of the contract."). In the case of Mr. Siag, he both (a) accepted the Contract of Representation in his sworn Power of Attorney and (b) proceeded in that document to instruct Claimant to act on his behalf in the ICSID arbitration and then accepted the benefits of that representation. Accordingly, he is bound under Texas law.[9]

40.    For instance, in *Hays v. Sullins*, the plaintiff lessor and defendant lessee negotiated a lease extension, but the defendant lessee never signed it. *See* 442 S.W.2d 494, 495 (Tex. App.—El Paso 1969, writ dism'd w.o.j.). The plaintiff lessor later sought to enforce the terms of the lease extension, and the defendant lessee argued that it was not binding because he had never signed it (even though he had used the property in question for one year of the alleged three-year lease term). *See id.* at 495-96. Under the legal principles quoted above, the court found that the defendant lessee was bound by the contract even though he did not sign it because he "nevertheless entered into and upon Plaintiff's farm and farmed the same for the year 1962. Defendant thereby became bound under the agreement for the full three (3) year term." *Id.* at

---

[9] Regarding arbitration clauses in particular, the Supreme Court of Texas has made clear that "neither the [Federal Arbitration Act] nor Texas law requires that arbitration clauses be signed, so long as they are written and agreed to by the parties." *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005).

496; *see also Endovasc, Inc. v. Dow Chem. Co.*, 2007 WL 4340261, at *2 (Tex. App.— Beaumont 2007, no pet.) (finding the defendant bound by the contract it did not sign because "[a] binding contract may be found when one party signs the contract, the terms of the contract are performed, and the benefits under the contract are accepted"); *Morgan v. Stover*, 511 S.W.2d 362, 365 (Tex. App.—Eastland 1974, writ ref'd n.r.e.) (finding the plaintiff could enforce the contract at issue even though he never signed it because he "performed under the terms of the lease [and] accepted the benefits of the extended term"); *Burke v. Shafer*, 189 S.W.2d 444, 446 (Tex. App.—Austin 1945, writ ref'd w.o.m.) (finding that the lease could be enforced even though it was missing one signature because it was "recognized and acted upon by all parties thereto for a period of over eight years").  Mr. Siag finds himself in the same situation as the parties attempting to refute their contact in these cases.  By his acts, conduct, and acquiescence, he accepted the terms of the Contract of Representation.  He and his mother's estate gained a US$ 133 million ICSID award thanks to Claimant's hard work over five years for which Claimant was not paid concurrently (or ever) for the services it rendered.  It is now time to pay, and Mr. Siag wishes to accept the benefits of the bargain but not accept the parallel contractual obligation of payment.  Texas law does not permit this.

41.     Even if this Tribunal were to find that Mr. Rami Siag is a nonsignatory to the Contract of Representation (which Claimant disputes based on the case law and facts set forth above holding that Mr. Siag is bound by the contract), he is still bound by the contract's arbitration provision under Texas estoppel law.  Texas courts recognize six theories arising out of common principles of contract and agency law that bind nonsignatories to arbitration agreements: "(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary."  *In re Kellogg Brown & Root, Inc.*, 166

S.W.3d 732, 739 (Tex. 2005). Direct-benefits estoppel—a type of equitable estoppel—applies in this case. Under direct-benefits estoppel "a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract itself." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005). This type of estoppel is derived from promissory estoppel, which provides that "[w]hen a promisor induces substantial action or forbearance by another, promissory estoppel prevents any denial of that promise if injustice can be avoided only by enforcement." *Id.* at 133.

42.     Here, Mr. Siag signed a sworn Power of Attorney that (a) stated that he is Clorinda Vecchi's successor; (b) acknowledged that the Contract of Representation provides that it is binding on Clorinda Vecchi's successors; and (c) as her successor, directed Claimant "[t]o prosecute to completion the ICSID Claim." *See* Ex. 8. On this representation, Claimant continued to prosecute the ICSID claim on Mr. Siag's behalf, ultimately obtaining a US$ 133 million award after over five years of work. *See* Smith WS ¶ 6. Having obtained this substantial action from Claimant by inducing it to continue to perform under the Contract of Representation, Mr. Siag cannot now equitably object to the arbitration provision contained in that contract. Thus, even if this Tribunal considers Mr. Siag a nonsignatory to the Contract of Representation, having exploited benefits from that contract, Mr. Siag is estopped from asserting that the lack of his signature precludes enforcement of the contract's arbitration provision. This Tribunal, therefore, has jurisdiction over Claimant's claims against Mr. Siag.

## V.     ADDITIONAL BRIEFING

43.     Should Respondents fail to provide a response to Claimant's Submission on Jurisdiction as they have failed to comply to date with the Tribunal's Interim Order of 30 March 2010, Claimant would be pleased to provide any additional briefing or argument on the matters

addressed in this brief or regarding any other jurisdictional issues that might be of assistance to the Tribunal.

## VI.   CONCLUSION

44.   For the foregoing reasons, Claimant respectfully requests that all of Respondents' jurisdictional objections be denied and that the Tribunal find that it has jurisdiction to hear the Claimant's claims as well as any and all claims that Respondents may bring in this arbitration proceeding as counterclaims.

Dated: 12 April 2010

Respectfully submitted,

GIBBS & BRUNS, L.L.P.

Robin C. Gibbs
Scott A. Humphries
Jeffrey C. Kubin
Anthony N. Kaim
1100 Louisiana, Suite 5300
Houston, Texas 77002
U.S.A.
Attn: Robin C. Gibbs

Telephone: +1 713 650 8805
Fax: +1 713 750 0903
Email: shumphries@gibbsbruns.com
& jkubin@gibbsbruns.com

Counsel for Claimant

# WITNESS STATEMENT OF REGINALD SMITH

## LONDON COURT OF INTERNATIONAL ARBITRATION
### Arbitration No. 91491

### KING & SPALDING LLP

Claimant

v.

### WAGUIH ELIE GEORGE SIAG, MONA SIAG, RAMI SIAG, TOURISTIC INVESTMENT & HOTELS MANAGEMENT (SIAG) S.A.E., AND SIAG-TABA CO.

Respondents

# WITNESS STATEMENT OF REGINALD R. SMITH

9 April 2010

1.      My name is Reginald R. Smith.  I am a partner at the law firm of King & Spalding LLP ("King & Spalding" or "Claimant"), and I work in the firm's Houston office.

2.      I was the partner-in-charge of King & Spalding's representation of our clients in the ICSID arbitration against Egypt that is at issue in this arbitration, which representation was conducted pursuant to the Contract of Representation among the parties.  Assisting me in this representation were numerous other partners at King & Spalding, including Mr. Ken Fleuriet who became a partner during the tenure of the case and who was the primary day-to-day attorney in charge of the case along with me.  In addition, of course, many talented and valuable associates at the firm also assisted on the case with everything from document review to drafting pleadings to legal research to preparing for hearings.

3.      For additional and extensive background on King & Spalding's work in the ICSID arbitration, I refer the Tribunal to my witness statement that accompanied Claimant's Statement of Case filed on 8 March 2010 as well as the witness statement of my partner, Mr. Fleuriet, which also accompanied that filing.  I will not repeat those facts here for the sake of brevity.

I.      **MR. JAMES CASTELLO AND HIS MEMBERSHIP ON THE LCIA COURT**

4.      The Contract of Representation between King & Spalding and its clients was executed by all parties in August and September of 2004.  At the time that contract was executed, no partner or attorney at King & Spalding was (or was anticipated to be) a member of the London Court of International Arbitration's ("LCIA") Board of Directors.  In fact, no partner or attorney at King & Spalding has ever been a member of the LCIA's Board of Directors.

5.      Similarly, at the time the Contract of Representation was executed in 2004, no partner or attorney at King & Spalding was (or was anticipated to be) a member of the Court

(sometimes known as the Arbitration Court) of the LCIA (the "LCIA Court").  The same was true in April of 2008 when Mr. Rami Siag executed his Power of Attorney dated 4 April 2008.  A current partner at King & Spalding is a member of the LCIA Court, but that partner (Mr. James Castello) did not join King & Spalding from Dewey & LeBoeuf until March 2009, having joined the LCIA Court in March 2007.

## II.   MR. RAMI SIAG'S POWER OF ATTORNEY

6.      On 4 April 2008, Mr. Rami Siag executed a Power of Attorney in favor of King & Spalding.  King & Spalding required that Mr. Siag provide this document and the representations therein in order to continue representing his claims in the ICSID arbitration against Egypt.  The firm needed his authority to represent his interests, and we wanted to ensure that Mr. Siag understood and agreed that—as a successor (in part) to his mother's ICSID claim—he was bound by the Contract of Representation and authorized the firm to continue pursuing the ICSID claim pursuant to that contract.

7.      As set forth in his Power of Attorney, Mr. Siag wanted King & Spalding to represent his interest in the ICSID claim on a going-forward basis, and he also endorsed all of the actions the firm had taken between the date of his mother's death and the date he executed his Power of Attorney.  Mr. Siag then proceeded to utilize, benefit from, and allow King & Spalding to represent his interest in the ICSID arbitration without protest or objection and without making any payment to King & Spalding for its services for over two years between 16 October 2007 (the date of his mother's death) and 17 November 2009 (the date we first learned of Respondents' secret settlement with Egypt).  Despite having benefited tremendously from King & Spalding's work on his behalf and on behalf of the other Respondents in this arbitration, Mr. Siag and the other Respondents have refused to pay King & Spalding anything for its work.

Again, the full extent of the work that went into winning the ICSID arbitration is set forth in my witness statement and the witness statement of Mr. Fleuriet that accompanied Claimant's Statement of Case dated 8 March 2010.

## III.   EXHIBITS ATTACHED TO CLAIMANT'S SUBMISSION ON JURISDICTION

8.      Attached to Claimant's Submission on Jurisdiction as Exhibits 1 through 19 are true and correct copies of emails and other documents that are kept in the regular course of business by either King & Spalding or Gibbs & Bruns, L.L.P. on behalf of King & Spalding.

I hereby attest to the truth and accuracy of this witness statement.

Respectfully submitted,

Date:   9 April 2010
        Houston, Texas                          _____
        U.S.A.                                  Reginald R. Smith

# DECLARATION

I declare under penalty of perjury that the foregoing Witness Statement of Reginald R. Smith originally dated April 9, 2010 is true and correct. Executed on this ____ day of June, 2010.

_____
Reginald R. Smith

## LONDON COURT OF INTERNATIONAL ARBITRATION
### Arbitration No. 91491

---

### KING & SPALDING LLP

Claimant

v.

### WAGUIH ELIE GEORGE SIAG, MONA SIAG, RAMI SIAG, TOURISTIC INVESTMENT & HOTELS MANAGEMENT (SIAG) S.A.E., AND SIAG-TABA CO.

Respondents

---

## EXHIBITS 1-23
## TO
## CLAIMANT'S SUBMISSION ON JURISDICTION

---

# EXHIBIT 1

**From:** steven gee [steven.gee.q.c@btinternet.com]
**Sent:** Tuesday, March 30, 2010 2:57 PM
**To:** Casework; Kasra Nouroozi; Luke.Irons@stonechambers.com; Jeffrey C. Kubin; Robin C. Gibbs; rsmith@kslaw.com; waguihESiag@aol.com; rsiag@siagtravel.com; rsiag@siagtravelegypt.com; manamino29@hotmail.com; Scott A. Humphries
**Cc:** Casework
**Subject:** Re: LCIA Arbitration No. 91491 - King & Spalding LLP vs. Waguih Elie George Siag, et al.


To: the Parties to the Arbitration below,
and their representatives set out below.
cc LCIA (Rémy Gerbay)

From Mr Steven Gee QC (Sole Arbitrator)


<u>LCIA Arbitration 91491: King & Spalding LLP –v- (1) Waguih Elie George Siag, (2) Mona Elie George Siag, (3) Rami Elie George Siag, (4) Tourist Investment & Hotels Management (SIAG) S.A.E., and (5) Siag Taba Co.</u>

Tuesday, March 30th  2010.


Dear All,

1.     There was an oral hearing today commencing at 11a.m. at Stone Chambers, 4 Field Court, Gray's Inn, London, as scheduled in these arbitral proceedings.

2.     The Respondents other than Mr Rami Elie George Siag are represented by Mishcon de Reya and by email dated 26th March 2010 to the LCIA, which was sent by them also today to the Tribunal, Mishcon de Reya have stated that they were instructed not to attend.  They also enclosed a further pleading from the proceedings before the U.S. District Court for the Southern District of Texas (Judge Melinda Harmon).  There was an email with attachment dated 9th March 2010 from Mishcon de Reya which the Tribunal has also considered.

3.     Mr Rami Elie George Siag has also sent the Tribunal an email dated 19th March 2010 stating that he was not proposing to attend.

4.     The hearing was attended by counsel for Claimant, Mr. Scott Humphries and Mr. Jeff Kubin of Gibbs & Bruns LLP, and Mr. Reginald Smith of Claimant.

5.     There are proceedings pending before the Federal District Court in the Southern District of Texas in which there are motions pending before Judge Harmon which were taken into account.



6.    In these circumstances it was just to proceed so as to consider:

   A.  The Respondents' position that the Tribunal should adjourn (in Mishcon's email dated 9th March 2010);

   B.  Challenges to the Jurisdiction by the Respondents;

   C.  The Applications for Interim Relief;

   D.  Further scheduling.

7.    In view of the fact that the hearing proceeded in the absence of the Respondents the Tribunal proceeded on the materials which have been served on them in advance of the hearing, and the materials relied upon by the Respondents.

8.    The Respondents deny that there is any binding or effective Contract of Representation or agreement to arbitrate.

(A) Adjournment

9.    The evidence before the Tribunal was of a case in which there was a need to consider each of the matters of Jurisdiction, Interim Relief and Further Scheduling in the Arbitration and where there was a risk of injustice if the Tribunal did not do so.  Furthermore the Respondents have been given proper notice of this hearing (the Respondents did not contend otherwise) and they were given the opportunity of attending it by video conference or telephone if they so desired.  It seemed to the Tribunal that it was a matter for the Respondents if they wished to attend.   The Tribunal declined to adjourn.

(B) Jurisdiction Challenges

10.    At the hearing, it was apparent that the Respondents represented by Mishcon de Reya (who represent all Respondents except Mr. Rami Siag) have raised issues concerning the jurisdiction of the Tribunal.  In particular, matters concerning jurisdiction arise from:

   A.  Plaintiff's Original Petition filed in Cause No. 2010-01557 in Harris County District Court on 11 January 2010;

   B.  The Reply Memorandum of Law filed in Cause No. 4:10-CV-367 in U.S. District Court for the Southern District of Texas on 19 March 2010; and

   C.  The Memorandum of Law filed in Cause No. 4:10-CV-367 in U.S. District Court for the Southern District of Texas on 8 March 2010.

11.    The issues concerning jurisdiction relate to (i) the circumstances in which the arbitration agreement in the alleged Contract of Representation was obtained, (ii) the arbitrability of certain issues which arise on the merits in this arbitration, and (iii) matters concerning individuals who are members of the Court of the LCIA.

12.     There was an email from Mr. Rami Siag to the Tribunal dated 19 March 2010 which challenged jurisdiction on the separate grounds concerning him.

13.     The Arbitration Clause in the alleged Contract of Representation provides for the situs of the arbitration to be in Houston, Texas.  Subject to whether this Clause is binding and further submissions, it would seem that if there is a contract to arbitrate it provides that (i) the agreed seat of the Arbitration is in Houston, Texas; and (ii) pursuant to Paragraph 7 of the alleged Contract of Representation, it would seem that the putative proper law of the contract is Texas law subject to submissions to the contrary.

14.     The LCIA Arbitration Rules, which are expressly incorporated into the alleged Contract of Representation, provide for jurisdictional challenges to be dealt with in accordance with Article 23 of those Rules.

15.     The Tribunal reserves to itself the power to decide whether there should be a separate award on jurisdiction alone or a single award on jurisdiction and the underlying merits combined.

16.     Subject to further submissions, the Tribunal is presently minded to make a separate award on jurisdiction because the matters which appear to arise in relation to jurisdiction seem to be discrete points which can be promptly resolved without the need to resolve the entire merits of the underlying dispute.  If the Respondents are correct that is an end to the arbitral proceedings.

17.     The proceedings pending before the U.S. District Court for the Southern District of Texas (Judge Melinda Harmon) raise issues which overlap with Respondents' jurisdictional challenges.  The fact that these issues have been raised and that certain relief is claimed in the U.S. District Court which concerns the arbitration agreement in the Contract of Representation does not in itself make it inappropriate for Respondents' jurisdictional issues to be considered by the Tribunal.  This is what is contemplated by Article 23 of the LCIA Rules and is in accordance with the principles of international arbitration, which allow the Tribunal to inquire into its own jurisdiction when a challenge is made to that jurisdiction.

18.     It has been suggested by the Respondents (Mishcon's email dated 9th March 2010) that it would save costs if the Tribunal waited for the judgment of Judge Harmon on the pending motions before her and/or on the merits of the proceedings pending before the U.S. District Court.  Where a jurisdictional challenge is raised before the Tribunal, the Tribunal should normally proceed to resolve that challenge one way or the other.  This is a case in which the motions pending before Judge Harmon may or may not result in a judgment by Judge Harmon which has application to the issues of jurisdiction raised in this arbitral proceeding.  Any judgment of Judge Harmon will be accorded the utmost respect.  It may be, depending on what happens in the future, that such a judgment will be binding on the parties in relation to the jurisdictional issues, or it may be that this is not the case.  For the moment, the Tribunal considers that progress should be made on the jurisdictional issues in the arbitration.

19.     In relation to the jurisdictional challenges referred to above, the Tribunal directs that

    i.     The Claimant is to provide by email to the Circulation List (for the meaning of this see the Tribunal's Letter dated 24th February 2010) submissions and supporting evidence as soon as possible but in any event by 12 April 2010 by 4p.m. (London Time).

    ii.    The Respondents are to provide their submissions and evidence on each and every jurisdictional challenge that they may have (not confined to those already raised) by email to the Circulation List within 28 days (including Saturdays, Sundays, and national holidays) from the date Claimant actually sends its submission via email in accordance with i above.

    iii.   The Claimant is to provide its reply submissions and evidence as soon as possible but not later than 14 days after the date the Respondents send their submissions in accordance with ii above.

    iv.    The Respondents are to provide their rejoinder submissions and evidence as soon as possible but no later than 14 days after the date Claimant actually sends its submissions in accordance with iii above.

    v.     Subject to further application or directions, the Tribunal may proceed on the basis of such submissions and evidence to make an award on the jurisdictional issues which are covered by those submissions.

<u>(C) Applications for Interim Relief and Order</u>

20.     The Tribunal has reviewed all of the submissions made by Claimant and Respondents (including evidence and exhibits attached to those submissions) since the beginning of this arbitral proceeding, including Claimant's Request for Arbitration and attached exhibits, Claimant's Supplement Request for Interim Relief and attached witness statement and exhibits, Claimant's Statement of Case and attached witness statements and exhibits, Respondents' filings in the U.S. District Court for the Southern District of Texas including all exhibits thereto, Mr. Waguih Siag's Declaration dated 6 March 2010 including Paragraph 29 thereof, and Mishcon de Reya's communications to the LCIA and the Tribunal, and Mr. Rami Siag's email to the Tribunal.

21.     The interim relief application has been considered taking into account the fact that there are jurisdictional challenges and the points raised by the Respondents.  In arbitral proceedings it is not appropriate for the tribunal to prejudge the substantive merits of the case.

22.     The Tribunal has paid careful attention to the issues raised by Respondents impugning the validity of the Contract of Representation, the effectiveness of that contract, and whether they are binding on Respondents.  These issues to be resolved on the merits in these arbitration proceedings.

The Tribunal considers that these issues will need to be resolved on the merits after a full hearing, and it would not be correct in any way to prejudge these issues.

23.     It would appear on the evidence that interim relief is necessary in the interests of justice to secure the proceeds of the settlement and to provide security so that should any award go against Respondents after a full hearing on the merits, any award is not rendered ineffective and nugatory through disposal of the settlement proceeds in the meantime. There is on the evidence a risk of irreparable harm if interim relief is not granted. It cannot be said that the Claimant's case is not sufficient in strength on the present materials such as to justify refusal of relief. Based on the present evidence the interests of justice require in all the circumstances that interim relief is granted to hold the position so that if an eventual award is made in favour of the Claimant it is not rendered nugatory or ineffective through dissipation of assets, and in particular dissipation made possible through not performing the alleged contract.

24.     The ICSID arbitration award was for US$ 133 million. There is evidence in the Declaration of Waguih Siag dated 6 March 2010 in the Federal District Court proceedings that the settlement was for US$ 80 million. This is a very substantial sum, which appears to be controlled by one or more of the Respondents. The Respondents have not provided or offered to provide any security out of those proceeds to the Claimant and dispute any obligation to pay the Claimant any fees or disbursements. The Claimant on its best case is only entitled to part of the settlement proceeds. Based on the evidence, I consider that the appropriate sum to order security for is US$ 60 million subject to further order. In particular, this figure can be adjusted following disclosure by the Respondents of the details of the settlement agreement and settlement proceeds.

25.     In these circumstances the Tribunal orders ("the Interim Order") as follows:

      A.   Each Respondent is to disclose and produce copies to the Claimant of all documents within their possession, custody, and power relating to or connected with the negotiation, terms of , or conclusion of the agreement to settle the ICSID arbitration against the Arab Republic of Egypt on or about 16 November 2009, including but not limited to the forgiveness of debt (if any), cancellation or partial cancellation of debt (if any), and any consideration whatsoever in connection with the settlement agreement. This disclosure and production of copies of documents is to be provided to the Claimant within 7 days of the date this Interim Order is sent to Respondents by email.

      B.   Each Respondent is to provide a sworn statement to the Claimant to the best of their information or belief setting forth fully: (i) The terms of any settlement agreement(s) with the Arab Republic of Egypt on or about 16 November 2009; (ii) What consideration was to be provided regarding any agreement(s) to settle; (iii) What consideration was in fact or is to be provided in connection with any agreement(s) to settle;(iv) Full details of payments made under any agreement(s) to settle including the name and address of the

bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account(s), the name of the recipient(s), and the amount(s); (v) What has happened to the proceeds of each such payment mentioned in sub-paragraph (iv), setting out, in relation to each payment, the use of those proceeds, the nature of any asset acquired, its location, the name under which the asset is held, and in relation to any money credited to any account the name and address of the bank(s) receiving any settlement payment(s), the date of such payment(s), the name and number of the account (s), the name of the recipient(s), and the amount(s); and (vi) A statement that the disclosures above are full and complete and that the document production required in i above is full and complete.

C.  This sworn disclosure is to be provided to the Claimant within 7 days of this Interim Order being sent to Respondents via email.

D.  The Respondents are to provide security for the amounts in dispute in this arbitration in the amount of US$ 60 million by first-class London bank guarantee payable by the bank on written demand by the Claimant and presentation of an arbitration award in favor of the Claimant, such payment from the guarantee to be in the amount directed in the award, and the guarantee to be available for multiple presentations with an aggregate limit of US$ 60 million in total.  The guarantee is to remain valid and effective unless and until exhausted by payment or a direction by the Tribunal that the same be discharged.  The expression "first-class London bank guarantee" means a guarantee to be provided by: (a) Barclays Bank PLC, (b) HSBC, (c) Lloyds Bank, or (d) J.P. Morgan Chase.  This security is to be provided as soon as possible and in any event within 14 days (including Saturdays, Sundays, and national holidays) from the date this Interim Order is sent to Respondents via email.  A draft of the intended first-class London bank guarantee is to provided to the Claimant as soon as possible and in any event within 10 days (including Saturdays, Sundays, and national holidays) from the date this Interim Order is sent to Respondents via email.

E.  The Respondents and each of them, whether by themselves, their servants, or agents, or otherwise howsoever, are ordered not to transfer, diminish in value, dispose of, or deal with in any way whatsoever (a) any proceeds of, or payments made as part of, the settlement of the ICSID arbitration against the Arab Republic of Egypt on or about 16 November 2009 or (b) any assets of whatsoever nature which have been acquired in whole or in part using such proceeds or payments or assets derived from such proceeds or payments pending further order or direction of the Tribunal.  Nothing in this Interim Order is to prevent the Respondents from acting pursuant to written permission given in advance by Claimant to deal with such proceeds, payments, or assets.  Furthermore, nothing in this Interim Order is to prevent Respondents from using said proceeds,

payments, or assets solely to provide the first-class London bank guarantee ordered above.

F.   The Tribunal intends to issue an Award pursuant to Article 26 of the LCIA Rules giving effect to this Interim Order.

G.   Any party may at any time apply to discharge or vary any of the orders and directions above.

H.   The Interim Order takes effect immediately but will lapse in the event that the Claimant does not provide a letter to the Tribunal and to the Circulation List (other than the Claimant and Gibbs & Bruns LLP) within 7 days of the date this Interim Order is sent to the Claimant by email, agreeing to abide and carry out any order which may hereafter be made by the Tribunal for compensation for loss (if any) caused by the Interim Order should any be sustained by the Respondents or any of them as a result of this Interim Order which in the opinion of the Tribunal the Claimant ought to pay.

## (C) Further Scheduling

26.      It seems to the Tribunal that this is a case in which directions can be given for the service of the Statement of Defence on the merits albeit that if the jurisdiction challenges succeed the merits will not arise.  The LCIA Rules allow for a single award addressing jurisdiction and merits.  The Tribunal is reserving the power to make a separate award on jurisdiction and is proceeding to give directions on both jurisdiction challenges and the resolution of the merits.

27.    The Tribunal orders the following regarding service of the Statement of Defence:

i.  Respondents' time for providing their Statement of Defence (including any counterclaims) is extended from 7 April 2010 to 21 April 2010 with liberty to apply for additional time.  The reason for the extension is that Claimant's Statement of Case is extensive.  For the avoidance of doubt, such Statement of Defence (including any counterclaims) is to be served without prejudice to Respondents' challenges to jurisdiction.

ii.  The service of the Statement of Defence (including any counterclaims) is not in any way to affect the right of Respondents to continue with their challenges to the Tribunal's jurisdiction.

iii.  The Tribunal reserves the right to set aside or vary these directions by further order.

Yours sincerely,

Steven Gee QC

(Sole Arbitrator)

# EXHIBIT 2

## CONTRACT OF REPRESENTATION

Waguih Siag, Mona Siag, Clorinda Vecchi, Touristic Investment & Hotels Management (SIAG) S.A.E., and Siag-Taba Co. (collectively, "SIAG") employ King & Spalding LLP ("K&S") pursuant to the terms and conditions set forth below to represent SIAG in a claim against the Arab Republic of Egypt ("Egypt") for its wrongful interference with SIAG's contractual rights under the Sales Contract, dated January 4, 1989, between Touristic Investment & Hotels Management (SIAG) S.A.E. and the Ministry of Tourism of the Arab Republic of Egypt for the purchase and development of property in Taba, Egypt (the "Dispute").

1.    Scope of Legal Services.

(A)    Diligence Period.    K&S will promptly commence its factual and legal investigation of the claims of SIAG against Egypt. K&S shall have sixty (60) days from the effective date of this Contract to determine whether it wishes to continue to represent SIAG based upon its diligence. If K&S concludes for any reason whatsoever in its sole discretion at the conclusion of this sixty (60) day period that it does not wish to continue to represent SIAG, K&S may terminate this Contract and all of its obligations hereunder by sending written notice to SIAG.

(B)    Initiation of Arbitration.    If as a result of its factual and legal investigation K&S recommends to SIAG that a good faith basis exists for bringing claims against Egypt, K&S will initiate an arbitration on behalf of SIAG against Egypt pursuant to the applicable arbitration rules (which may require written notice to Egypt in advance of the filing of a request for arbitration), pursue the arbitration, represent SIAG with respect to any subsequent appeals or annulment proceedings, and represent SIAG in all settlement negotiations with Egypt (both before and after initiating arbitration).




1



(C)   Co-counsel.  K&S will have primary responsibility for the legal representation, and it shall serve as lead counsel for SIAG.  SIAG has indicated that it intends to retain attorney Todd Weiler to assist K&S in connection with the representation.  SIAG will be solely responsible for satisfying the fees and expenses of Mr. Weiler.

2.   Contingency Fee.  In consideration for the services rendered and to be rendered by K&S in the prosecution of its claims, SIAG sets over and assigns to K&S a fee interest to be determined as follows:

(A)  Settlement Before Filing of Request for Arbitration ("RFA") – If SIAG settles the Dispute with Egypt between the effective date of this Contract and date on which K&S files a RFA on behalf of SIAG, K&S's fee interest will be five (5) percent of SIAG's gross recovery.  Gross recovery means the total amount received by SIAG without deducting any expenses incurred by SIAG or K&S in connection with the Dispute.

(B)  Settlement After Filing of RFA and Before Award on Jurisdiction – If SIAG settles the Dispute with Egypt between the time K&S files the RFA and the Tribunal issues its Award on Jurisdiction, K&S's fee interest will be ten (10) percent of SIAG's gross recovery.  This provision 2(b) applies only in the event the Tribunal has a separate hearing and award on the issue of jurisdiction.  If the Tribunal chooses to decide the issue of jurisdiction at the same time it rules upon the merits, paragraph 2(C) will govern K&S's fee interest.

(C)  Settlement After Filing of RFA and Before Award on Merits (No Separate Hearing and Award on Jurisdiction) – If SIAG settles the Dispute with Egypt between the time K&S files the RFA and the Tribunal issues its Award on the Merits, K&S's fee interest will be fifteen (15) percent of the first fifty million dollars ($50 million) of SIAG's gross recovery and ten (10) percent of all amounts in excess of fifty million dollars ($50 million).



2




(D). Settlement of Payment of Judgment After Award on Merits -- If SIAG settles the Dispute with Egypt or obtains and collects a judgment from Egypt after the Tribunal issues its Award on the Merits, K&S's fee interest will be twenty (20) percent of the first fifty million dollars ($50 million) of SIAG's gross recovery and seven and one-half (7 1/2) percent of all amounts in excess of fifty million dollars ($50 million).

It is recognized that in the event any of SIAG's claims are resolved through the receipt in whole or in part by SIAG or any of its affiliated business interests of non-monetary consideration (e.g., property or other tangible assets), K&S will be entitled to the above percentages of any cash recovery plus a payment of cash equal to the applicable percentage multiplied by the monetary value of the non-monetary recovery (based upon the present cash value of the non-monetary consideration at the time of such recovery). If SIAG and K&S cannot agree on the monetary value of the non-monetary recovery, the parties agree that their dispute will be resolved pursuant to the dispute resolution provision contained in paragraph 8 of this Contract. However, K&S will be entitled to immediate payment of any portion of the recovery not in dispute.

The parties agree that any payment of a settlement or judgment by Egypt shall be made into a client escrow account maintained by K&S. K&S's fee interest pursuant to paragraph 2 and expense reimbursement pursuant to paragraph 3 of this Contract will be deducted and the balance shall be wire transferred to SIAG pursuant to its written instructions.

3.      Advancing and Reimbursing Expenses.  K&S agrees to advance on behalf of SIAG all reasonable and necessary expenses incurred by K&S in the prosecution of SIAG's claims up to an agreed cap of five hundred thousand dollars ($500,000). SIAG shall be solely responsible for all expenses incurred by K&S in excess of five hundred thousand dollars ($500,000). Expenses

3

shall include, but not necessarily be limited to, expert fees and expenses, travel costs, hotel accommodations, out of town meals, arbitration filing fees, arbitrator charges, court reporter charges, computer legal research charges, document management and handling charges, long distance telephone charges, copying charges, telecopier charges, and courier charges. K&S shall in no event be responsible for the expenses of its co-counsel (Mr. Weiler) or of SIAG, including but not limited to those of Mr. Siag or his family members.

In the event SIAG fails for any reason to pay expenses incurred by K&S in excess of this agreed cap of five hundred thousand dollars ($500,000) when requested to do so by K&S, K&S may, in its sole discretion, continue to advance all reasonable and necessary expenses in excess of this agreed cap. If K&S advances expenses in excess of the agreed cap, K&S will be entitled to an additional fee interest of one (1) percent of SIAG's recovery for every fifty thousand dollars ($50,000) of advanced expenses in excess of the agreed cap.

If SIAG receives a recovery by settlement or award from Egypt, it agrees that K&S shall be reimbursed for all expenses that K&S has advanced on its behalf from SIAG's net recovery (following the calculation and payment of K&S's fee interest, which shall be computed based on the gross recovery amount as described above).

4.  **Withdrawal and Termination.**

(A)   In addition to the termination rights contained in paragraph 1(A) above, K&S shall be allowed to withdraw from its employment on SIAG's behalf if, in the sole opinion of K&S, SIAG's claims are not warranted under existing law and cannot be supported by a good faith argument for an extension, modification, or reversal of existing law. If K&S elects to withdraw, K&S will not be entitled to a fee for work performed up to the time of its withdrawal.



4

(B)   SIAG may terminate its involvement in the arbitration at any time for any reason; provided, however, that if SIAG chooses to terminate its involvement in the arbitration, K&S shall be entitled to recover from SIAG its attorney's fees calculated at three (3) times K&S's standard hourly rate for time incurred on the case at the time of such termination.

5.   Duty to Cooperate.  SIAG agrees to cooperate and comply with all reasonable requests of K&S in connection with the preparation and presentation of the SIAG claims.

6.   Settlement.  No settlement of the SIAG claims shall be made without the full knowledge and approval of SIAG.  K&S shall keep SIAG advised of developments in the prosecution of its claims.  If K&S recommends that SIAG settle its claims for an amount that has been offered in writing by Egypt and SIAG refuses to do so for any reason, K&S shall be entitled to attorney's fees equal to its contingency fee interest in the proposed settlement amount, plus K&S's attorney's fees from that point forward at its standard hourly rates.  If K&S recommends in writing that SIAG refuse to settle its claims for an amount that has been offered in writing by Egypt and SIAG nonetheless chooses to settle, K&S shall be entitled to attorney's fees equal to the higher of its contingency fee interest in the proposed settlement amount or one hundred fifty (150) percent of its standard hourly rate for time incurred by K&S on the case at the time of such settlement.

7.   Choice of Law.  The rights and obligations of the parties to this Contract shall be governed by Texas law, without regard to the choice of law rules of Texas.  The Texas Code of Professional Responsibility shall similarly govern K&S's representation of SIAG in this matter.



5



8.   Dispute Resolution:

Any dispute, controversy or claim, whether based on contract, tort, statute, regulations, or otherwise, arising out of or relating in any way to this Contract, the relationship of the parties, or the obligations of the parties, including without limitation, any dispute as to the existence, validity, construction, interpretation, negotiation, fraud-in-the-inducement, performance, non-performance, breach, termination, or enforceability of this Contract, as well as any dispute regarding jurisdiction or arbitrability, shall be resolved through final and binding arbitration, it being the intention of the parties that this is a broad form arbitration agreement designed to encompass all possible disputes among the parties relating to K&S's representation of SIAG in connection with the Dispute. This right to arbitrate the disputes, claims, or controversies under this Contract shall survive the termination of this Agreement.

The arbitration shall be conducted in accordance with the Arbitration Rules of the London Court of International Arbitration as in effect on the date of commencement of the arbitration proceeding.

The arbitration shall be conducted by a sole arbitrator, who will be selected by the parties. If the parties fail to agree on the arbitrator within thirty (30) days after the initiation of the arbitration, then the London Court of International Arbitration shall appoint the arbitrator.

The situs of the arbitration under this Agreement shall be in Houston, Texas, U.S.A. The arbitration proceedings shall be conducted in the English language.

9.   Effective Date:

The effective date of this Contract shall be the date of the last signature on this Contract.



6

10. Severability.

If any provision of this Contract is deemed to be unenforceable for any reason whatsoever, the remainder of this Contract shall remain in full force and effect.

11. Counterparts.

This Contract may be executed by the parties in counterparts.

12. Entire Agreement.

The parties agree that this Contract constitutes their entire agreement, and all prior discussions and understandings are merged into this Contract. This Contract may not be modified or amended except in writing signed by all parties.

13. Notices.

All notices sent under this Contract shall be deemed properly given if sent by express delivery, facsimile, or electronic mail to the parties at the following addresses:

SIAG:
Waguih Siag
Touristic Investments & Hotels Management (SIAG) S.A.E
59, Sakkara Road P.O. BOX 107 AHRAM Giza Cairo, Egypt
Telephone: +20 -2- 77 17 321/2
Fax: +20-2-77 17 323
Electronic Mail: WaguihESiag@aol.com

KING & SPALDING LLP
Reginald R. Smith
1100 Louisiana Street
Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Fax: (713) 751-3290
Electronic Mail: rsmith@kslaw.com

7



14.   Assignment.

This Contract shall inure to the benefit of and bind the successors and assigns of the parties hereto. SIAG represents and warrants that it has not assigned any of the claims against Egypt which are the subject of this Contract to any person or entity which is not a signatory of this Contract.

WAGUIH SIAG

Date: _23 / 8 / 2004_

MONA SIAG

Date: _26 . 08 . 2004_

CLORINDA VECCHI

Date: _23 . 8 . 2004_

TOURISTIC INVESTMENT &
HOTEL MANAGEMENT (SIAG) S.A.E.

By: _____

Its: _CHAIRMAN_

Date: _23 / 8 / 2004_

8

SIAG-TABA CO.

By: _____

Its: _____

Date: _____

ACCEPTED:

KING & SPALDING LLP

_____

Date: _____

9

# EXHIBIT 3

Filed 10 January 11 P3:09
Loren Jackson - District Clerk
Harris County
ED101J015628695
By: Nelson Cuero

NO. _____

| | | |
|---|---|---|
| WAGUIH SIAG, INDIVIDUALLY, | § | IN THE DISTRICT COURT OF |
| AND AS REPRESENTATIVE OF | § | |
| TOURISTIC INVESTMENT & HOTELS | § | |
| MANAGEMENT COMPANY (SIAG), | § | |
| and SIAG-TABA COMPANY | § | |
| | § | HARRIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| KING & SPALDING, LLP, AND | § | |
| REGINALD R. SMITH, INDIVIDUALLY | § | ___ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION FOR
## DECLARATORY JUDGMENT & DEMAND FOR JURY TRIAL

TO THE HONORABLE JUDGE AND JURY OF SAID COURT:

COME NOW Waguih Siag, Individually, and As Representative of Touristic Investment and Hotels Management Company (SIAG) and SIAG-TABA Company, Plaintiff herein, and brings this causes of action against King & Spalding, LLP and Reginald R. Smith, Individually, Defendants herein, and for cause of action would show unto the Court and Jury the following.

### 1. DISCOVERY CONTROL PLAN

Plaintiff intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.3 because the amount in controversy exceeds $50,000.00.

### 2. PARTIES

Plaintiff, Waguih Siag ("SIAG"), an individual, is a resident of France, and is the representative of Touristic Investment and Hotels Management Company (SIAG) and SIAG-TABA Company.

---

**EXHIBIT**
tabbies
3

Defendant, King & Spalding, L.L.P. ("King & Spalding"), is a law firm and limited liability partnership doing business in the State of Texas. Defendant, King & Spalding, L.L.P., can be served with citation herein by serving its registered agent, Robert E. Meadows, 1100 Louisiana Suite 4000, Houston, Texas 77002. However no service of process is needed at this time.

Defendant, Reginald R. Smith ("Smith"), is an attorney licensed to practice in the State of Texas who can be served with citation herein at his place of employment, King & Spalding, L.L.P., 1100 Louisiana Street, Suite 4000, Houston, TX 77002-5213, (713) 751-3226. However, no service of citation is needed at this time.

### 3. JURISDICTION AND VENUE

This Court has jurisdiction and venue over this case because Smith is a Texas resident, King & Spalding maintains a place of business in Harris County, Texas and/or the acts and omissions giving rise to Plaintiffs' claims occurred in Harris County, Texas. The damages being sought by Plaintiffs exceed the minimum jurisdictional limits of the Court.

All conditions precedent for the prosecution of the claims asserted herein have been performed or have occurred.

### 4. ATTORNEY-CLIENT RELATIONSHIP

At all times material, Smith was a partner, shareholder, representative, agent and/or associate attorney engaging in the practice of law at King & Spalding.  All of the specific acts complained of herein below are attributable to the conduct of Smith, who was an attorney associated with King & Spalding as a partner, agent, servant, representative and/or employee. The liability and responsibility of Smith, as well as King & Spalding, is vicarious and joint and several, and, further, Plaintiffs plead the legal theory of respondeat superior as between Smith and King & Spalding. Also, at all times

material, Smith and King & Spalding, whether acting directly, or indirectly or vicariously through their partners, agents, servants, representatives and/or employees acted as attorneys for Plaintiffs. Likewise, Plaintiffs were clients of Smith and King & Spalding and were entitled to absolute fidelity from both Smith and King & Spalding because of their fiduciary duty to Plaintiffs..

## 5. FACTS

All of the allegations contained in the above paragraphs are re-alleged and incorporated herein as though they were fully set forth.

On August 23, 2004, at its offices in Houston, Harris County, Texas, Defendants drafted, entered into, and executed a contract of representation (the "contract") to provide legal services to Plaintiffs pertaining to a claim against the Arab Republic of Egypt ("Egypt"). The contract provided for a contingent attorney fee structure for King & Spalding of 20% of any arbitration award up to $50 million after arbitration on the merits and thereafter, 7 ½ % of any additional award over $50 million.

For expenses, the contract provided that the first $500,000.00 of arbitration expenses were to be initially covered by King & Spalding, and any expenses over $500,000.00 were to be paid by Plaintiffs, but would be paid by King & Spalding in the event Plaintiffs were not able to pay them. In any case, the contract provided that the incursion of expenses was within the sole discretion of King & Spalding. Ultimately, King & Spalding was entitled to reimbursement of all expenses they advanced out of any recovery. However, the contract further provided that for every $50,000.00 in expenses King & Spalding paid over $500,000.00, an additional 1% contingent fee shall be added to King & Spalding's attorney fee recovery. After assurances from King & Spalding to Plaintiffs that expenses of $500,000.00 were accurately estimated, Plaintiffs retained the services of King & Spalding under the terms described above.

At the conclusion of arbitration, Plaintiffs were awarded approximately $133 million. However, King & Spalding claimed a fee of over 80% of that sum. King & Spalding claimed this fee based largely on an alleged expenses in excess of $3,000,000.00, incurred at their sole discretion, thus triggering the contract's additional 1% contingent fee for every $50,000.00 over $500,000.00. By use of this unconscionable fee provision in the contract and the contract's provision for incursion of expenses at their sole discretion, King & Spalding attempted to collect a contingent attorney fee percentage from Plaintiffs of over 80% of their total recovery, but could have potentially made claim to more than 100% of Plaintiff's recovery should additional expenses be incurred. Such a fee is unconscionable as a matter of law.

After Plaintiffs were awarded a favorable judgment in arbitration, Egypt moved to annul the arbitration award on various grounds. At this point, knowing that King & Spalding was already claiming over 80% of their total recovery and fearing that further representation by King & Spalding to fight the annulment and proceed with collection efforts as King & Spalding recommended was nearly certain to require Plaintiffs to forfeit their entire $133 million recovery to King & Spalding, Plaintiffs negotiated a settlement with Egypt for $80 million, thereby causing Plaintiff damages of $53 million in lost recovery. If King & Spalding had not negligently, nor alternatively, maliciously, drafted their fee contract in such a way as to provide for a potential 100% contingency fee recovery, negligently failed to control expenses of litigation, and/or effectively communicate with Plaintiffs regarding expenses during the pendency of the arbitration, Plaintiffs would not have been forced to prematurely settle with Egypt giving up $53 million to save the possibility of retaining at least a fraction of its own recovery from arbitration. King & Spalding's negligent and/or fraudulent

representation placed Plaintiffs in the incredibly unenviable position of having to realize the risk of

losing $53 million to Egypt or $133 million to King & Spalding.

## 6. COUNT 1 – SUIT FOR DECLARATORY RELIEF

All of the allegations contained in the above paragraphs are re-alleged and incorporated herein

as though they were fully set forth.

Plaintiffs are entitled to a declaratory judgment that the entire contract is void because

provisions contained therein violate and/or in contravention to Article X, Section 9 of the State Bar

Rules, Texas Disciplinary Rules of Professional Conduct. Specifically, restrictions on settlement

authority, provisions that are punitive in nature in the event of client's termination of the underlying

action, and the lawyers' unfettered and unrestricted authority regarding incurring expenses (for which

the lawyers would never be responsible, in any event) and thus increasing their fee creates in effect

a proprietary interest on the lawyers' behalf in the client's claim and/or a statutorily impermissible

retention of settlement authority, all of which violate at least Sections 1.02, 1.04, 1.06 and 1.08 of

the above identified portion of the Texas Disciplinary Rules of Professional Conduct. As such, the

fee contract in question is void and unenforceable.

Alternatively, Plaintiffs are entitled to a declaratory judgment that the entire contract is

unconscionable and voidable at Plaintiffs' election because:

    (1)    King & Spalding took unfair advantage of Plaintiffs' limited cash resources in negotiating the contingent attorney fee and expense structure in the contract;

    (2)    King & Spalding attempted to collect a contingent fee interest in Plaintiffs' arbitration recovery of over 80%;

    (3)    King & Spalding negotiated and drafted a grossly unfair contingent attorney fee structure in the contract for legal representation in an arbitration claim with virtually no risk of loss on its merits;

(4)     King & Spalding negotiated and drafted a contingent attorney fee structure and arbitration expense calculation tie-in that provided incentive for inflation of expenses in order to reap a potentially unlimited contingent fee percentage;

(5)     The purpose of the contract and Plaintiffs' retention of King & Spalding, to recover damages from Egypt, was completely nullified by the effect of the virtually limitless contingent attorney fee and expense tie-in structure in the contract;

(6)     King & Spalding did incur unnecessary expenses in arbitration by converting a fact witness into an expert witness, thus paying expert witness fees and expenses;

(7)     King & Spalding incurred unnecessarily high expenses of over $1,000,000.00 for expert witnesses related to valuation of property that had already been examined by previous experts at a small fraction of the cost and when other competent expert witness testimony and evaluation was available at a small fraction of the cost;

(8)     Insofar as King & Spalding incurred $1,000,000.00 for expert witnesses on valuation for Plaintiff's arbitration claims, King & Spalding took unfair advantage of their sole discretion to incur fees on Plaintiff's behalf for a cause of action that had virtually no chance of success;

(9)     King & Spalding incurred unnecessarily high expenses of over $100,000.00 to research Egypt's assets at two banks when this information was readily available publicly by a simple internet search at no cost whatsoever;

(10)    King & Spalding made no effort to maintain expenses in line with its original $500,000.00 estimate by reasonably informing Plaintiffs as to facts and expectations material to their representation of Plaintiffs; and

(11)    King & Spalding negotiated and drafted a grossly unfair settlement consent provision in the contract that effectively granted King & Spalding an impermissible proprietary interest in Plaintiffs' cause of action by fixing the basis of King & Spalding's contingent fee percentage on settlement offers regardless of actual settlement value or recovery.

### 7. COUNT 2 – NEGLIGENCE

Specifically, Plaintiffs would show the following errors and/or omissions collectively and

each in the alternative as to the conduct of Smith and King & Spalding in their legal representation of Plaintiffs:

(1) Negligently negotiating and drafting a contingency attorney fee contract with an expense tie-in provision that allowed for payment of an unlimited contingency fee percentage of Plaintiffs' total arbitration recovery in addition to full recovery of any advanced expenses;

(2) Negligently failing to recognize the conflict of interest the contract created in its attorney-client relationship with Plaintiffs;

(3) Negligently underestimating expenses of arbitration at $500,000.00 when the actual expenses resulted in over $3,000,000.00;

(4) Negligently failing to properly communicate its incursion of expenses to Plaintiffs at reasonable and material points in its representation of Plaintiffs;

(5) Negligently failing to inform Plaintiffs of the advisability of retaining independent counsel to advise them as to the potential effect of the contract;

(6) Negligently failing to fully and adequately advise Plaintiffs of the effect of the expense tie-in's relationship and potential effect on the ultimate potential attorneys fee for King & Spalding;

(7) Negligently failing to control expenses at a reasonable level in line with its own estimate of expenses and expense "cap" in the contract;

(8) Negligently failing to search for and retain expert witnesses at a reasonable rate that would comport with its own estimate of expenses and expense "cap" in the contract;

(9) Utilizing their sole discretion to incur expenses in order to negligently incur $1,000,000.00 in expenses for expert witnesses on property valuation to pursue a claim in arbitration with virtually no chance of success after their $500,000.00 expense cap had already been reached;

(10) Negligently failing to make use of a witness in his capacity as a fact witness instead of incurring the expense of the same witness as a retained expert;

(11) Negligently failing to make use of previous expert witnesses, their reports, and evaluations that were already paid for by Plaintiffs in litigation leading up to the arbitration for which King & Spalding were hired;

(12)   Negligently failing to make use of free and relatively easy to execute internet searches of Egypt's assets in two banks, but instead paying an individual over $100,000.00 to do same;

(13)   Negligently failing to recognize that drafting and negotiating a fee structure with Plaintiffs such as they did would likely put Plaintiffs in the position of risking the loss of 100% of its arbitration award in exchange for prematurely settling with Egypt for $53 million less than its arbitration award;

## 8. COUNT 3 – COMMON LAW FRAUD & FRAUDULENT INDUCEMENT

Specifically, Plaintiffs would show the following acts collectively and each in the alternative as to the conduct of Smith and King & Spalding in their legal representation of Plaintiffs:

(1)   Representing to Plaintiff that expenses of arbitration were reasonably estimated at or near $500,000.00;

(2)   King & Spalding knew that such a low estimate for expenses was not a true estimate of expenses;

(3)   King & Spalding estimated expenses of $500,000.00 recklessly, as a positive assertion, and without knowledge of the estimate's truth;

(4)   King & Spalding knew, or reasonably should have known, that its accurate estimate of expenses was critical to Plaintiff's decision to retain King & Spalding because King & Spalding's contingency fee interest was tied directly and effected dramatically by King & Spalding's incursion of expenses;

(5)   King & Spalding made their fraudulently low estimate of expenses fully intending that Plaintiff rely on such estimate inducing them to retain King & Spalding's services on the contingency fee and expense tie-in terms offered;

(6)   Plaintiff did in fact rely on King & Spalding's estimate of expenses and retained the services of King & Spalding for representation in arbitration by signing a contingent fee agreement with King & Spalding;

(7)   King & Spalding's fraudulently low estimate of expenses caused Plaintiff injury.

Alternative and in addition, King & Spalding's unconscionable contract included an arbitration clause that provided for all disputes arising out of the contract to be arbitrated under the authority

and oversight of the London Court of International Arbitration ("LCIA").  Plaintiff was fraudulently induced to agree to this arbitration clause because King & Spalding fraudulently failed to disclose that one of its own partners is, and was at the time of the arbitration agreement's execution, a member of the LCIA's board of directors.  Because of King & Spalding's fiduciary duties owing to Plaintiff, such a blatant conflict of interest should certainly have been disclosed to Plaintiff by King & Spalding before execution of the arbitration agreement.  Had King & Spalding disclosed this material, gross, and continuing conflict of interest to Plaintiffs before execution of the arbitration agreement, Plaintiffs would never have agreed to it.  Instead, Plaintiff reasonably relied on King & Spalding's fiduciary duty to disclose these very types of material facts and conflicts of interest related to their representation and agreed to the arbitration clause.  Plaintiff has now incurred damages by King & Spalding's attempts to invoke the authority of the LCIA to institute arbitration proceedings pursuant to their unconscionable and fraudulently induced arbitration agreement.

Alternatively, to the extent members of King & Spalding assumed director positions with LCIA or a person or persons with an existing association with LCIA become members/partners of King & Spalding, after King & Spalding formed an attorney client relationship with Plaintiff, King & Spalding failed to disclose this information and the conflict created thereby to its client.  Such failure to disclose information material to representation is tantamount to fraud and, independently and in conjunction with other grounds raised herein, is a breach of fiduciary duty and a conflict of interest which precludes the enforceability of the arbitration provisions in question, as well as the fee contract as a whole.

## 9.  COUNT 4 – BREACH OF FIDUCIARY DUTY

Alternatively, and without waiving the foregoing, at all times material to Smith's and King & Spalding's representation of Plaintiffs, the attorney-client relationship created a fiduciary duty which required Smith and King & Spalding to exercise the highest degree of care, good faith, and honest dealing, and obligating them to commit no act of deception or misrepresentation no matter how slight.  For that reason, the conduct of Smith and King & Spalding complained about herein above also constitutes a breach of their fiduciary duty to Plaintiffs.  Specifically, King & Spalding's failure to disclose the clear conflict of interest of including an arbitration agreement in the contract that provided for arbitration under the authority and oversight of the LCIA while also having one of their own partners serving on the board of the LCIA and King & Spalding's failure to disclose the unconscionable nature of their fee interest in Plaintiff's claims, constitute breaches of King & Spalding's fiduciary duties to Plaintiff.  Additionally, it was a further breach of fiduciary duty for King & Spalding to fail to disclose to Plaintiff that King & Spalding intended, by various provisions in the contract, to charge Plaintiff an unconscionable fee.  Such breaches entitle Plaintiffs to actual damages, as well as to a forfeiture of legal fees paid or owing to Smith and King & Spalding.

## 10. DAMAGES

All of the allegations contained in the above paragraphs are re-alleged and incorporated herein as though they were fully set forth.

### Actual Damages

Regarding the causes of action and conduct alleged above, Plaintiffs have sustained actual losses which were proximately caused by the joint conduct of Defendants. Said losses exceed the

minimum jurisdictional limits of this Court.  After completion of discovery, Plaintiffs will amend its

pleadings in order to indicate more specifically the damages suffered.

### Punitive Damages

Regarding the causes of action and conduct alleged above, Plaintiffs are entitled to punitive

damages against Defendants.  After completion of discovery, Plaintiffs will amend its pleadings in

order to indicate more specifically the amount of punitive damages sought.

### Fee Forfeiture

As a result of Defendants' breach of fiduciary duty described above, Plaintiffs are entitled to

an hereby request a judgment that Defendants have forfeited any attorneys' fee, whether collected

or claimed, arising out of its representation of Plaintiffs pursuant to the contract.

## 11. ATTORNEY'S FEES

Plaintiffs are entitled to recover reasonable and necessary attorney fees that are equitable and

just under Texas Civil Practice & Remedies Code section 37.009 because this is a suit for declaratory

relief.

## 12. JURY DEMAND

Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## 13. PRAYER

For these reasons, Plaintiffs asks that Defendants be cited to appear and answer and the court

declare the contract void and unenforceable.  In addition, Plaintiffs ask for the following damages:

that judgment be entered  for Plaintiffs against these Defendants, jointly and severally, that costs of

court be taxed against the Defendants, that Plaintiff have prejudgment as well as post-judgment

interest, and for such other and further relief, at law and in equity, to which Plaintiff may show

themselves to be justly entitled, to which the Court believes them deserving, and for which they will ever pray.

Respectfully submitted,
DOHERTY ✦ WAGNER

/s/ Brett Wagner
BRETT WAGNER - SBN: 20654270
brett@dlwlawyers.com
13810 Champion Forest Drive Suite 225
Houston, Texas  77069
281-583-8700 — 281-583-8701-Fax

- and -

MARK W. LONG & ASSOCIATES
Mark W. Long - SBN: 129214950
101 West 6th Street Suite 720
Austin, Texas 78701
512-329-5005 — 51-322-2096-Fax

ATTORNEYS FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WAGUIH SIAG, INDIVIDUALLY, AND AS REPRESENTATIVE OF TOURISTIC INVESTMENT & HOTELS MANAGEMENT COMPANY (SIAG) and SIAG-TABA COMPANY | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. _____ |
| KING & SPALDING LLP and REGINALD R. SMITH | § § § | |
| Defendants. | § | |

## AFFIDAVIT OF REGINALD R. SMITH

BEFORE ME, the undersigned notary public, on this day personally appeared REGINALD

R. SMITH whose name is subscribed hereto and who, after being by me duly sworn, did upon his

oath depose and state as follows:

1.   I am over eighteen years of age. I have not been convicted of a felony and am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2.   I am a partner at King & Spalding LLP. I have been a partner since 1995.

3.   In June 2009, after five years of arbitration proceedings in which King & Spalding represented Waguih Siag, Touristic Investment & Hotels Management Company (SIAG), Siag-Taba Company, and others against the Arab Republic of Egypt, the ICSID (International Centre for Settlement of Investment Disputes) arbitration tribunal awarded the plaintiffs over $75,000,000. I was the partner in charge of King & Spalding's representation. Egypt subsequently lodged an annulment appeal with ICSID, which was scheduled for hearing in November 2009. That hearing never occurred because, with no notice to King & Spalding and in breach of the Contract of Representation, Plaintiffs secretly negotiated and consummated a settlement with Egypt that circumvented King & Spalding's fee interest in the dispute.

4.   The signature of Waguih Siag on the Contract of Representation attached as Exhibit 2 to Defendants' Motion to Compel Arbitration is Mr. Siag's signature. Mr. Siag also signed the Contract of Representation on behalf of Touristic Investment &



EXHIBIT
3

Hotel Management Company (SIAG) and Siag Taba Company, and his signature is
........................................................................................................................ 11

         D.     No Federal Statute or Policy Renders the Claims Non-Arbitrable ...................... 15

         E.     The Federal Arbitration Act Mandates That This Court Stay This
              Lawsuit Pending the LCIA Arbitration Proceeding ............................................. 15

III.     CONCLUSION ............................................................................................................... 16

CERTIFICATE OF SERVICE ................................................................................................... 17

Defendants King & Spalding LLP and Reginald R. Smith request that this Court compel Plaintiffs to arbitrate their claims brought against Defendants in this lawsuit pursuant to the arbitration agreement in the Contract of Representation that governs the relationship between Plaintiffs and Defendants. *See* 9 U.S.C. §§ 4, 206. Defendants also request that this Court stay this lawsuit pending arbitration. *See* 9 U.S.C. § 3.

## I.   INTRODUCTION

### A.   Summary

All of Plaintiffs' claims in this lawsuit arise out of and exist solely because of the Contract of Representation among Plaintiffs and Defendants in which King & Spalding agreed to represent Plaintiffs in a legal dispute. *See* Ex. 1 (Plaintiffs' Original Pet.). Specifically, Plaintiffs' claims complain about their obligations under the contract and about Defendants' performance under the contract. *See id.* at 3-5. All of these claims must be arbitrated pursuant to the broad-form arbitration provision contained in the Contract of Representation. *See* Ex. 2 ¶ 8 (Contract of Representation). This Court should compel arbitration.

### B.   Factual Background

This case arises out of a fee dispute. In September 2004, King & Spalding, through one of its partners, Reginald Smith, entered into a Contract of Representation with Plaintiffs in which King & Spalding agreed to represent Plaintiffs in a dispute with the Arab Republic of Egypt over the expropriation of a 161-acre resort property on the Red Sea. *See* Ex. 2 at 1. King & Spalding took a contingent fee interest in any settlement amount or award-on-the-merits recovered from the dispute. *See id.* at 2-3. In June 2009, after five years of arbitration proceedings, the ICSID (International Centre for Settlement of Investment Disputes) arbitration tribunal awarded Plaintiffs over $75,000,000. *See* Ex. 3 ¶ 3 (R. Smith Affidavit). Egypt then lodged an

1